J-A19023-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| C.S. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| B.M. | |
| Appellant | No. 2053 WDA 2014 |

Appeal from the Order Entered November 24, 2014
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD01-08702-004

BEFORE:  BENDER, P.J.E., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                **FILED OCTOBER 05, 2015**

D.M. ("Mother") appeals from the November 21, 2014 order entered in the Allegheny County Court of Common Pleas granting C.S. ("Father") primary physical and legal custody of Daughter and primary physical custody and sole legal custody regarding school decisions of Son.[1]  We affirm.

The trial court set forth the following history:

> The parties are parents to two children, Daughter A.S. (DOB [12/1998]) and Son C.T.S. (DOB [9/2000]). Litigation on issues of custody began in 2001 and has continued at a fairly regular pace.2  The parties divorced in 2004, and both have subsequently remarried.  Father and Ca.S. (hereinafter "Stepmother") have a seven-year-old son, S.S., who is a half-brother to the children.  Mother has no other children with her current husband, T.M. (hereinafter "Stepfather.")  The relevant history of the present custody dispute began roughly in 2012, when

_____

[1] Father chose to not submit an appellate brief.

Mother became the primary physical custodian of the parties' minor children. Daughter was 13, and Son was 11. Daughter testified that there was a great deal of tension when she lived with her [m]other. Son apparently did not have such conflict with Mother. Both children struggled in school. Son repeated the sixth grade. The tension between Daughter and Mother continued to the point where Daughter began hurting herself. The self-harm culminated with her suicide attempt in April 2013. Thereafter, Daughter had made it known that she was victim of Mother's half-brother's sexual abuse.

[2] The extensive docket is a graphic representation of the acrimony between the parents.

In April 2013, [the trial c]ourt granted Father interim physical and legal custody of Daughter. Father petitioned the [c]ourt to modify custody. Continuations and disagreements regarding psychological evaluations extended litigation. The matter was finally heard on October 24, 2014. The trial was then extended over the course of three more dates: October 28, 2014, to November 13, 2014 and ended on November 20, 2014.

On November 20, 2014, after four days['] worth of testimony, [the trial c]ourt announced its decision from the bench and discussed its findings on the record. *See* T4, at 137-164. That discussion included the [c]ourt's findings per the custody factors enumerated in 23 Pa.C.S.A. §5328(a). The [c]ourt memorialized its decision by way of the November 21, 2014 [o]rder of [c]ourt, which provoked the subject appeal.

1925(a) Opinion ("Opinion"), 2/3/2015, at 1-2.

The custody order provides, in relevant part:

AND NOW, this 21st day of November, 2014, after four days of trial on October 24, 2014, October 28, 2014, November 13, 2014 and November 20, 2014 to consider Plaintiff's Petition to Modify Custody and Defendant's Petition for Special Relief with [Father] having appeared with counsel and [Mother] having appeared with counsel, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Custody of [Daughter]: Father shall have primary physical and legal custody of the minor [Daughter].

2. Mother and [Daughter] shall participate in reunification therapy.

a. Mother shall select and schedule therapy every other week with [Daughter].  Such therapist shall have an office within 10 miles of Father's home. Mother shall schedule the therapy after school or on weekends and not schedule the therapy on days where [Daughter] has an activity.

    i. For every therapy session, Mother and Father shall share equally the co-pay with the therapist. Father shall send his share of the co-pay with [Daughter]. If [M]other selects a therapist who requires co-pay in excess of a total of Twenty Dollars ($20.00), Mother shall pay the remaining balance of the excess co-pay.

    ii. Mother shall pick up and drop off [Daughter] at Father's home if [Daughter] agrees.  Alternatively, Mother may arrange for and pay for a taxi service to take [Daughter] from Father's house to the therapist and Father shall pick [Daughter] up from the therapist after the session.  Father and [Stepmother] shall remain in the home or in the car during the exchange and shall not communicate in any way with Mother at the exchange.

    iii.  Both parents shall be present and attend the therapy sessions only as specifically directed by the therapist in advance of the appointment.

b. If Mother and [Daughter] would like to have visits outside of the therapeutic visits, these visits can be discussed and scheduled within the therapeutic setting, and memorialized in writing between [Daughter] and Mother.

c. Father shall respect such written arrangements including overnights and weekends at Mother's home if [Daughter] agrees.

d. These scheduled visits shall respect [Daughter's] already existing obligations and activities.

e. Father shall send a written calendar to each therapeutic appointment containing any very significant family events that would create conflicts that would preclude [Daughter] from scheduling a visit with her mother in the upcoming month.

f. Mother shall provide all transportation for these visits with [Daughter].

3. Custody of [Son]: Father shall have primary physical custody of [Son]. Father shall have sole legal custody with regards to making school choices for [Son]. Mother and Father shall share legal custody regarding all other issues.

a. [Son's] School Year: Father shall have custody of [Son] during the school year. This schedule shall begin after Christmas on December 31, 2014 at noon through that week and the weekend that follows. Mother shall have every other weekend thereafter beginning Friday after school, when Mother picks [Son] up at school until Monday morning before school when Mother shall drop [Son] off at school.

b. [Son's] Summer Vacation: Mother shall have custody of [Son] primarily during the summer vacation from school. Mother's schedule with [Son] shall begin the first Friday after the last day of school until the Friday of the following week at 4:00 p.m. when Father's weekend shall begin. Then Father shall have every other weekend during the summer beginning Friday at 4:00 p.m. until Monday morning before Father starts work when he will drop [Son] off at Mother's home. Father shall pick up and drop off [Son] from Mother's home and remain in his car during the exchange and shall not communicate in any way with Mother at the exchange.

. . .

Order, 11/21/2014.

Mother filed a timely notice of appeal and statement of matters complained of on appeal. The trial court filed an opinion pursuant to Pennsylvania Rule of Appellate Procedure 1925.

- 4 -

At argument before this Court on July 7, 2015, it became apparent that proceedings subsequent to the November 21, 2014 custody order had occurred in the trial court, which potentially impacted the custody order. On August 11, 2015, this Court remanded to the trial court to supplement the record or conduct additional hearings as necessary.[2] On August 20, 2015, the trial court filed "Further Findings of Fact," clarifying that the June, 2015 conciliation proceedings addressed a motion for contempt[3] filed by Mother and resulted in an interim order temporarily providing custody of Daughter to Mother because Father was not permitting Daughter to visit Mother as Daughter wanted. Further Findings of Facts at 2; Interim Order of Court,

---

[2] This Court's August 11, 2015 Judgment Order vacated the November 2014 trial court order. On September 10, 2015, this Court amended its August 11, 2015 Judgment Order to reinstate the November Order.

[3] Mother entitled the *pro se* motion a "petition for custody," but the court interpreted it as a motion for contempt because Father refused to release Daughter. The trial court explained:

> [D]ue to the grave safety concerns, the allegations of contempt, and [the trial court's] knowledge of Daughter's mental health issue, [the trial court] set the matter for a conciliation to discuss matters for contempt and issues of safety and arranged for an *in camera* interview with Daughter to determine how best to proceed. On June 17, 2015, following the conciliation and interview with Daughter, [the trial court] allowed Daughter to stay with Mother on an interim basis while Daughter discussed in therapy with her parents and a mental health professional her desire to move to Mississippi with paternal aunt.

Further Findings of Fact at 2.

6/17/2015. The June order did not alter the November custody order, which permitted Mother and Daughter to agree to visits outside of therapy. Further Findings of Fact at 3. On August 20, 2015, the trial court issued an order vacating its June Order.[4]

Mother raises the following claims:

> 1. Whether the trial court ignored the best interest of the child and erred by granting [M]other no partial custody of Daughter (except to take her to counseling) which is detrimental to the reunification of Mother with the child;
>
> 2. Whether the trial court erred in basing its decision to transfer primary physical custody of Son from Mother to Father on the child's grades where there was no credible record evidence of the same or, to the extent there was such evidence, in ignoring that the child might simply not be a stellar student and not every child is capable of exemplary academic achievement;
>
> 3. Whether the trial court ignored the best interest of the child and erred by granting custody of Son, to Father given:
>
>> a. The child's strong, unequivocal reasoned preference to be with Mother;
>>
>> b. The child's strained relationship with [Stepmother] and excellent relationship with [Stepfather];

---

[4] On July 29, 2015, Father filed a petition for special relief, raising contempt issues and requesting that Daughter be permitted to attend school in Mississippi with relatives. Further Findings of Fact at 2-3. The court conducted another conciliation. The trial court found the contempt issues moot because the trial court reinstated the November order. *Id.* at 4-5. Further, it found the November order would allow Father to send Daughter to stay with relatives while she continued her schooling. *Id.* at 5.

c. The need for stability and continuity, in the child's life [] by taking the child away from his home, school, friends, neighborhood, and activities.

Appellant's Brief at 11.

Our scope and standard of review of child custody orders are as follows:

[O]ur scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*J.M.R. v. J.M*, 1 A.3d 902 (Pa.Super.2010) (quoting *Collins v. Collins,* 897 A.2d 466, 471 (Pa.Super.2006)).

"The primary concern in any custody case is the best interests of the child." *J.M.R.*, 1 A.3d at 900. "The best-interests standard, decided on a case-by-case basis, considers all factors that legitimately have an effect upon the child's physical, intellectual, moral, and spiritual well being." *Id.* (citing *Saintz v. Rinker,* 902 A.2d 509, 512 (Pa.Super.2006)). When determining whether modification of a custody order "is in a child's best interest, the court has an obligation to consider all relevant factors that could affect the child's well-being." *Id.* (quoting *Ketterer v. Seifert,* 902

A.2d 533, 539 (Pa.Super.2006)). Specifically, pursuant to 23 Pa.C.S. § 5328:

> In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.
>
> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.
>
> (2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).
>
> (3) The parental duties performed by each party on behalf of the child.
>
> (4) The need for stability and continuity in the child's education, family life and community life.
>
> (5) The availability of extended family.
>
> (6) The child's sibling relationships.
>
> (7) The well-reasoned preference of the child, based on the child's maturity and judgment.
>
> (8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.
>
> (9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328. Further, the "party seeking modification of custody arrangements has the burden to show that modification is in the child's best interest." *Id.*

### A. Custody of Daughter

Mother's first issue challenges the trial court order granting Father primary physical and legal custody of Daughter.

Mother claims the November order, which limits Mother's visits with Daughter to semi-weekly reunification counseling sessions and other visits only if Mother and Daughter agree to meet, violates the public policy of Pennsylvania, which guards the rights of non-custodial parents. Appellant's Brief at 22-24. She further references supervised visitation, which, she alleges, is employed only for "compelling circumstances" and where it would

be the "least restrictive alternative." *Id.* at 24. Mother argues the order does not even grant supervised visitation, rather it allows Daughter to determine whether she and Mother will have contact. *Id.*

Mother argues the trial court's conclusion that "Daughter is a danger to herself while in Mother's care" and its statement that the trial court's "concern for Daughter's safety decided the matter" are not supported by the record. Appellant's Brief at 25. Mother claims "[t]he only evidence of any 'suicide attempt' was Daughter's *in camera* testimony: 'and then there was a couple times I tried to kill myself.'" *Id.* at 25. She claims the only testimony about a Facebook message was from Mother, who testified Daughter posted the word "Good-bye" on her Facebook page.

Mother also claims the trial court mischaracterized the testimony regarding the sexual abuse and harassment of Daughter by Mother's half-brother. Appellant's Brief at 26. Mother claims there were no allegations of abuse. Rather, Daughter testified the half-brother "sexually harassed" her. *Id.* She notes that there were no founded Allegheny County Children Youth and Families reports or criminal proceedings, no dependency proceedings, and no evidence at trial that "Mother's half-brother behaved at all inappropriately towards Daughter." *Id.* at 26-27.

The trial court noted its custody decision was "influenced a great deal by safety concerns; namely, Daughter is a danger to herself while in Mother's care." Opinion, 2/3/2015, at 4. The trial court made the following findings:

Mother initially had primary physical custody of Daughter after a trial was held in January 2012. The trial did little to stop the litigation as the docket remained active in the months that followed. In April 2013, Daughter sent a detailed Facebook message to Father's sister interpreted by all as a suicide note.[5] Father's sister informed Father who informed the police. Daughter testified that she tried to kill herself. Daughter was then taken to the Sewickley Valley Hospital emergency room. Thereafter, she checked herself into a mental health facility called Southwood. Upon her release two weeks later, Daughter was placed in Father's custody in the interim while she received treatment.

Sometime thereafter, it was revealed that Daughter had been, for years, sexually abused and sexually harassed by Mother's half-brother, who is allegedly a couple years older than Daughter. At age 12, Daughter reported this to Mother, but Mother refused to believe her. Worse still, Mother encouraged Daughter not to say bad things about the family. To this day, Mother refuses to believe Daughter despite the fact that Daughter's accusations have led to multiple investigations, and despite the fact that Daughter has sought and received therapy from a variety of mental health professionals, including the Center for Traumatic Stress. Mother has refused to believe Daughter even after she started cutting herself, even after she started doing poorly in school, and even after Daughter tried to kill herself. Despite it all, Mother has never spoken with her half-brother about the allegations. Mother believes that Father and Stepmother have put the child up to making such allegations. Mother calls Daughter a lair. Naturally, this has led to the disintegration of the Mother-Daughter relationship. Daughter testified that she loves Mother and that she even misses her. But Daughter was adamant that she does not trust her. To Daughter's great

_____

[5] Daughter communicated with her Aunt through Facebook and following either one of these exchanges or the "Good-bye" message, her Aunt became concerned and called the police. N.T., 10/24/2014, at 214-15; N.T., 11/20/2015, at 17-18. Mother took Daughter to Sewickley Valley Hospital. N.T., 11/20/2015, at 18.

credit, she still attempts to salvage her relationship with her Mother, but on her own terms. Those terms include reunification therapy and visitation only under conditions with which Daughter is comfortable.[3] But to date, Mother had largely obstructed the reunification process.

[3] Daughter displayed significant maturity as she outlined her insights and the terms necessary for a relationship with Mother, while at the same time protected her ongoing recovery from the abuse.

As to the actual therapy, Daughter testified that Mother refuses to think that the therapy is for both of them — that Mother thinks that she is simply taking the child to see a therapist. Eventually the sessions with the therapist ceased prematurely, because Mother, allegedly not seeing the point, refused to pay the $25 co-pay. Apparently Mother believed that going out to dinner with Daughter would be better. Mother seemingly argued that Father should have to pay the copay, per the child support order's language regarding unreimbursed medical expenses. [The c]ourt also notes its disappointment with Father, as he had an opportunity to keep the therapy going by paying the co-pay in full while the issue was resolved. In the absence of this therapy, Daughter has resorted to seeing the school counselor once per week.

Mother and Daughter's visitation has been equally problematic. In the months prior to trial, [the c]ourt twice contemplated and adjudicated disputes regarding the visitation arrangement between Mother and Daughter. The first was after the [c]ourt interviewed the child during a conciliation, which resulted in the April 28, 2014 [o]rder of [c]ourt. Another [o]rder of [c]ourt was issued on July 10, 2014, adding the specificity which was apparently lacking in the first order. The visitation arrangement was designed to be in public (a Starbucks at an outdoor mall), brief, and somewhat supervised by Father so that Daughter felt comfortable and safe. Daughter requested, and this Court ordered, that Father was to sit a few tables away so that Daughter could feel it was within her power to leave if the visit soured. So as to make Daughter feel that it was within her power to get up and leave of her own free will, Daughter requested, and [the c]ourt ordered, that Father was to sit a few tables away. The

supervision was necessary so that Daughter could terminate the conversation if she felt manipulated, or "pulled in" by Mother's words. Despite [the c]ourt's careful explanation of said arrangement, Mother feigned ignorance and proceeded with a disturbing lack of compassion for the trauma that Daughter faced.

In two instances, Mother invited to the visitation Mother's girlfriends, all of whom were old family friends who have children Daughter's age. In one visit, two of Mother's friends sought to catch up with Daughter and remind her of friends that Daughter has not seen since she left Mother's custody. In the next visit, Mother sent these same friends to let Daughter know that she was running late to the visit. At best, such decisions represent Mother's poor judgment. The fact that Mother sought to catch up with old friends and invite them to her Daughter's reunification visitations, or, that she ran 15 minutes late to a one-hour, once-weekly reunification visit, could be indicative of a belief that such visits are not particularly serious. Perhaps that was the case. At worst, Mother's moves were designed to play on Daughter's guilt for leaving Mother (and especially Son) and to create conflict with Father. Mother's testimony regarding these visits was simply not believable and such testimony seriously damaged her credibility.

Mother testified that Mother and Daughter were very happy to see each other at one of the visits, where they talked about memories and old pictures. Mother testified that Daughter is very happy to see her but that Daughter will "switch" when Father makes his presence known during the visitation. Daughter has asked Mother to apologize for not believing her sexual abuse claims. Mother thinks that is strange and that Father is putting Daughter up to it. Mother thinks that Daughter speaks and acts coolly toward her because Father is around. Mother is blinded by her belief that the disintegration of her relationship with Daughter is of Father and Stepmother's doing, not her own. For his part, Father handled the situation terribly. He was publicly argumentative and disparaging in front of Daughter. If Father thought his response to Mother's transgression was justified, he is sorely mistaken and would do well to act more appropriately.

- 13 -

> The [c]ourt takes the time to detail these aspects, because its decision to keep Daughter with Father is fundamentally one of safety.

Opinion, 2/3/2015, at 4-7 (internal citations omitted).

Additionally, the trial court conducted a comprehensive discussion of the custody factors following the trial. *See* N.T., 11/20/2014, at 137-150 (finding: (1) neither party would encourage and permit frequent and continuing contact with Daughter and other party; (2) Daughter was victim of sexual assault in Mother's care, which Mother would not acknowledge; (3) Father provided safe and stable household for Daughter; (4) Daughter "transferred allegiance to [Father's] household and community and has made a successful transition to the academic and social environment" at her new school; (5) no evidence of extended family, except stepparents, who have been supportive of Daughter; (6) sibling relationship is important; (7) both parents have attempted to turn Daughter against other parent; (8) Father has more stable, consistent, and nurturing relationship for Daughter's current needs; (9) Father more likely to attend to educational, emotional, physical and developmental needs of Daughter; (10) no history of drug and alcohol abuse; and (11) no issue of physical or mental condition that would impact case; and awarding primary physical and legal custody of Daughter to Father and requiring Mother and Daughter to attend therapy and, permitting additional visits if Mother and Daughter agreed). The court also made factual findings and discussed the custody factors in its 1925(a) opinion. Opinion, 2/3/2015, at 4-9, 17 (noting: (1) Mother refused to

believe Daughter was abused or that therapy was for both Mother and Daughter; (2) Mother and Daughter visits have been problematic; (3) Father has obstructed the reunification of Mother and Daughter; (4) court's "concern for Daughter's safety decided the matter"; and (5) although Daughter expressed desire to have relationship with Mother, "[b]ecause her relationship was so damaged with [Mother], and because Daughter has excelled in her recovery under Father's custody, [the court found] Father is more likely to maintain the right parental relationship necessary for Daughter's emotional needs" and finding: (1) neither party encourages and permits frequent and continuing contact between Child and other party; (2) threat of abuse of Daughter no longer present, but Daughter is threat to herself if in Mother's care;  (3) Father performed all parental duties well; (4) need for stability and continuity is paramount and increased forced visitation or custody would jeopardize recovery; (5) Mother did not discuss extended family at trial and schedule would not prevent Daughter from seeing Mother's extended family; (6) Daughter and Son bond is extremely close; (7) Daughter had clear preference to stay with Father; (8) Father should not disparage Mother in front of Daughter and should not obstruct a relationship with Mother; (9) Father more likely to maintain the right parental relationship necessary for Daughter's emotional needs; (10) Father more likely to attend to daily physical and emotional, developmental, educational and special needs, given Daughter's trauma and emotional recovery; (11) distance between residences is roughly 45 minutes; (12) both parents able

to make appropriate child care arrangements; and (13) no concerns regarding drugs and alcohol).

After a thorough review of the record, we find the trial court's conclusions are reasonable and it did not err in granting primary custody of Daughter to Father.

### B. Custody of Son

Mother next challenges the trial court's order granting Father primary physical custody and sole legal custody as to educational decisions of Son.

Mother claims the "only reason" the trial court removed Son from Mother's primary care and his school was his "grades" and there was no evidence of Son's grades admitted at the hearing. Appellant's Brief at 30-32. This argument lacks merit.

The trial court noted that "[i]t is not the case that Son was removed from his Mother[] because he did not do his homework. The issue is far more complex than the simplicity with which Mother argues it." Opinion, 2/3/2015, at 10. The trial court found Son struggled for years, was held back in the sixth grade, nearly had to repeat it again, and almost failed seventh grade. *Id.* at 11. At the time of trial, Son was failing a third of his classes. *Id.* The trial court then noted "[m]ore worrisome for the [c]ourt than, say, a score on a project, is that Son stated that he is being called stupid by his classmates," and he was "very compelling" when he spoke on the topic. *Id.* at 11. The trial court found Mother's testimony "problematic," noting Mother gave "an unreasonable amount of weight to Son's social life."

*Id.* Mother testified to Son's popularity at school, "referred to him as the ring-leader of the neighborhood," and said his friends were "free to come over his house on the weekends." *Id.* The court noted "given[] Son's fairly significant difficultly in school, [it had] to question Mother's parenting priorities." *Id.* The trial court then noted that there was a "strong indication that Son is not getting the parenting support he needs at home with Mother." *Id.* at 12. Son demonstrated the ability to succeed and was sensitive to his poor school performance. *Id.* The trial court was not convinced Mother was attentive to his needs and found Father was better suited to provide educational care. *Id.*

Mother next argues that Son wanted to stay with Mother and the trial court erred in not following Son's wishes. Appellant's Brief at 34-35. Mother also argues the court erred because Son had a strained relationship with Stepmother, but an excellent relationship with Stepfather. Appellant's Brief at 35. Mother also contends the trial court erred by granting Father primary custody of Son due to the need for stability and continuity in Son's life. Appellant's Brief at 38-42. Mother claims the trial court failed to safeguard Son's "basic physical and psychological needs" in regard to school choice. *Id.* at 39. This claim also lacks merit.

The trial court found Son's preferences were not strong and unequivocal. Opinion, 2/3/2015, at 12. Son wanted to live with both parents, does not like it when Father and Stepmother make disparaging comments about Mother and Stepfather, and is particularly sensitive to

name-calling when sister bickers with Father and Stepmother. *Id.* at 13. However, Stepmother was the biggest disciplinarian, which impacts a middle-schooler's preference. *Id.* Further, the trial court noted that Mother has "at times, set Son up for failure," including not informing him about a scheduled vacation with Father and forcing him to choose whether to stay with Mother or go with Father on Father's scheduled weekend. *Id.* at 13-14. The trial court noted Son's excellent relationship with Stepfather was just one of many factors. *Id.* at 15.

The trial court also discussed stability and continuity. It noted Son had a good group of friends, and the custody change would affect the relationships. Opinion, 2/3/2015, at 16. However, Son had done poorly in school and the trial court found the change in schools was in Son's best interest. *Id.* The court noted there was a chance Son would be unable to participate in his extracurricular activities next year if his grades did not improve and the extracurricular activities were a big reason he lacked the time and energy to concentrate on his schoolwork. *Id.* at 16-17. The court noted it would be difficult for Son to spend less time with Mother and Stepfather, but found the parties' locations, which were 45 minutes from each other, did not permit another arrangement. *Id.* at 17.

Further, the trial court thoroughly discussed the custody factors following the trial. N.T., 11/20/2014, at 150-164 (finding: (1) neither party encourages contact with the other; (2) one abuse issue with Stepfather, but Son did not take seriously and trial court did not see it as an issue; (3) Son

- 18 -

has a home with both parties, but has not been doing well in school with Mother; (4) stability and continuity favor Mother; (5) Son's preference is to reside with Mother; (6) Mother more likely to maintain loving, stable, consistent and nurturing relationship; (7) Father more likely to attend to physical, emotional, developmental, educational and special needs of Son; and (8) because of lack of proximity of residences, Son will reside with Father during school year). The trial court also made findings as to the factors in its 1925(a) opinion. *See* Trial Court Opinion, 2/3/2015, at 9-18 (finding: (1) ample evidence Mother tried to turn Son against Father by withholding Son and preventing regular contact; (2) both parties offer safe environments for Son; (3) both parents perform parental duties for Son and can provide for his emotional needs; (4) change "comes at a cost to the world with which Son is accustomed, but stability and continuity for the sake of stability and continuity does not outweigh the other relevant factors"; (5) extended family not discussed at trial and custody schedule would not prevent Son from seeing Mother's extended family; (6) bond between Daughter and Son is extremely close and Son will be able to spend more time with his half-brother; (7) Son's preference was not strong and unequivocal; (8) evidence Mother tried to turn Son against Father; (9) both family can provide for Son's emotional needs; (10) Father is best suited to attend to Son's developmental, educational, and special needs; (11) distance between parties prevents an alternative arrangement; (12) both parents are able to make appropriate child care arrangements; (13) Son's

best chance for having healthy relationship with both parents is if Father has primary custody; (14) there are no allegations of drug or alcohol abuse; and (15) Both offer safe environments for Son).

The trial court's conclusions are reasonable and it did not err in awarding primary physical custody of Son to Father and sole legal custody regarding school decisions of Son to Father.

Order affirmed.[6]

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/5/2015

---

[6] Appellant's "Application for Relief Pursuant to Pa.R.A.P. 123 Ancillary to Pending Appeal and Petition for Review Pursuant to Pa.R.A.P. 1501(A)(3) – Writ of Mandamus and Prohibition" is denied.