Gregg W. COLLINS, Appellee,

v.

Paris J. COLLINS, Appellant.

Superior Court of Pennsylvania.

Submitted Oct. 31, 2005.

Filed March 13, 2006.

Reargument Denied May 18, 2006.

Heather Z. Reynosa, York, for appellant.

James G. Nealon, III, Harrisburg, for appellee.

BEFORE: STEVENS, BOWES, and McCAFFERY, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, Paris J. Collins ("Mother"), appeals from the trial court's order denying her petition for relocation and granting Appellee, Gregg W. Collins ("Father"), primary physical custody of the parties' three minor sons. Specifically, Mother asks us to determine whether the trial court erred in concluding that the best interests of the children precluded relocation and the award of primary custo- dy to Mother. After careful review and consideration, we reverse.

¶ 2 The relevant facts underlying this appeal are as follows. Mother and Father are the natural parents of three children: I.C., born on April 22, 1989; J.C., born on October 4, 1991; and N.C., born on June 9, 1999. The children were all born during the approximately eighteen-year marriage of the parties. In February 2005, Mother left the marital residence that she shared with Father in York, Pennsylvania, and moved to her parents' residence in Utah. She took the parties' three sons with her, without Father's knowledge or consent; however, there was no previous or current custody order in effect at that time. Fa- ther then filed a complaint, seeking both a divorce from Mother and primary custody of the children. Mother's response includ- ed filing a petition for primary custody and for permission to relocate to Utah. An interim order, issued on March 28, 2005, awarded joint legal and physical custody to both parents and required that the chil- dren remain in Pennsylvania pending reso- lution of the case.

¶ 3 A custody/relocation hearing was held on April 25, 2005, at which four wit- nesses testified: Father, Mother, and the paternal and maternal grandmothers of the children. The testimony primarily concerned parenting abilities and activities, as well as the financial circumstances of the parties. In most aspects, the testimo- ny among the various witnesses was not in conflict.

¶ 4 Mother testified that she had taken the children to Utah in order to escape the foul language and yelling to which Father subjected her and the children. (Notes of Testimony ("N.T."), 4/25/05, at 92, 97–99). Both parents acknowledged that they had used foul language during their arguments in the presence of the children. (*Id.* at 70, 116–17). Father also testified that he had

spoken in a degrading manner to the middle child. (*Id.* at 61, 72). However, Father testified that he was working on anger management issues and was in the process of being evaluated for a program of counseling. (*Id.* at 74).

¶ 5 There was considerable testimony about newspaper delivery routes that the family had operated. Father acknowledged that he had insisted that his sons share responsibility for morning and evening newspaper delivery routes in order to bring needed money in to the household.[1] Although by the time of the custody hearing the family was no longer engaged in the newspaper delivery business, Father had ignored for months Mother's objections to the work, as well as the objections of the children, who argued that their schoolwork was suffering because they had to wake up so early to get the deliveries done. (*Id.* at 35–38, 64–65). In hindsight, Father agreed with Mother that the newspaper route had been a poor choice of activity for their sons. (*Id.* at 38).

¶ 6 The paternal grandmother testified that for nearly all of the time since March 28, 2005 (the date of the interim custody order), she had been living with Father and the children in the marital home. She had been assisting Father with parental responsibilities, including cooking, cleaning, and doing laundry for the household. (*Id.* at 76–77, 85–86).

¶ 7 There was extensive testimony about the reasons for and the extent of the family's financial difficulties. Father acknowledged that he had been terminated from several positions over the course of the past fifteen years, and that during most of 2003 and 2004, he had not been employed on a full-time basis. (*Id.* at 56–60). These problems were clearly reflected in Father's income for 2004, which amounted to only twelve-hundred dollars ($1,200). (*Id.* at 12). Father further testified that he was approximately seventeen-thousand dollars ($17,000) in debt and that his parents had provided financial assistance, in the form of seven or eight mortgage payments in the past year, as well as food donations and payment of car repair bills.[2] (*Id.* at 34–35, 65–66). As a result of the various financial problems, Father was in the process of filing for bankruptcy by the time of the custody hearing. (*Id.* at 34). Finally, Father testified that he had recently started working as an independent insurance agent, a position in which his income would depend entirely on commissions. (*Id.* at 12–13).

¶ 8 Mother testified that while she was living in Pennsylvania, she had worked part-time at a fast food restaurant. (*Id.* at 92). With regard to her move to Utah, she testified that she had already secured a minimal-wage position as a housekeeper near her parents' residence, where she would be living. (*Id.* at 99, 104, 113–14). She also testified that she wanted to study medical transcription at a college located near her parents' residence in order to be able to obtain higher-paying employment. (*Id.* at 104–05, 126). The maternal grandmother testified that she was prepared to provide financial assistance to Mother and the children, including the purchase of airline tickets to enable the children to return to Pennsylvania to visit Father, if Mother and the children were permitted to relocate to Utah.[3] (*Id.* at 145).

---

1. The routes consisted of approximately 300 customers, at maximum.

2. The paternal grandmother testified that she and the paternal grandfather had assisted with ten mortgage payments during the past year and that over the years they had loaned the parties over forty-thousand dollars ($40,000). (*Id.* at 81, 86).

3. Evidence was also received on a few other issues, including the suitability of the former marital residence and the maternal grandpar-

¶ 9 On May 11, 2005, the court announced its decision from the bench.[4] The court explained the best interest standard and then summarized its decision as follows:

THE COURT: In considering the best interests of the children and all of the credible evidence that we have considered in this case, we conclude that it is not in the best interests to permit the children to relocate to Utah. Having reached that conclusion, we will ask if mother's intent is to remain here with the children or to remain in Utah?

[MOTHER'S COUNSEL]: Your Honor, I have addressed this numerous times with Mrs. Collins. At this time her statement to me is that she would remain here if she was able to reside in the home with the children, but I cannot guarantee that to her unless the Court would be willing to make that some type of condition. She sincerely wants to be with her children, but it's financial at this time.

THE COURT: All right. Under the circumstances, we have to concluded, [sic] therefore, that it is in the best interests to award majority physical custody of the children to father and we will review generally the reasons for our decision first and then go into the detailed reasons for our decision.

(N.T., 5/11/05, at 8–9).

¶ 10 Later in the proceedings, the court referred to Mother's equivocation concern-ing where she would live if the children remained in Pennsylvania:

THE COURT: Mother has indicated that she does not know at this point if she is able to relocate to York [Pennsylvania]. Clearly if she did, we believe she would be the better parent for these children.

(*Id.* at 22).

¶ 11 The specific provisions of the court's custody order included the following: the parents were awarded joint legal custody; Father was awarded primary physical custody; Mother was awarded physical custody during the summer and on some holidays; the responsibility to pay the cost of the children's transportation was assessed to Mother, except for the Christmas holiday, when Father would pay transportation costs. (Trial Court Order for Custody, dated May 11, 2005, at 1–5.)

¶ 12 The court made clear that it was unhappy with the choices with which it was presented, stating that "the best we can do from this bad situation is keep the children where they are in father's custody." (N.T., 5/11/05, at 22). In making its decision, the court relied primarily on its conclusion that the children would have more stability in their lives if they continued to reside in the former marital home in Pennsylvania with Father. The court inferred that Mother's relocation to Utah to live with her parents was only a temporary situation, implying a second move at some point in the future, which would further destabilize the children's lives. (*Id.* at 15–

---

ents' residence, (*id.* at 32–33, 101–03, 136–38), and the health problems of the parties. (*Id.* at 39–40, 42–43, 67–68). Mother has recurring symptoms resembling mini-strokes, and Father is a type-2 diabetic, not presently under treatment by a physician. (N.T., 4/25/05, at 39–40, 42–43, 67–68). The trial court did not consider these health problems as factors in its decision. (N.T., 5/11/05, at 19).

4. In its Rule 1925(a) Statement, the trial court stated that its reasons for the order on appeal were to be found in the Notes of Testimony from May 11, 2005, at pages 3–23. The Statement also noted one additional factor in the court's decision: that Mother had removed the children from Pennsylvania without Father's consent and had not enrolled them in school during the several weeks they spent in Utah.

16). In addition, the court expressed great concern that, if relocation were permitted, the parties would not have the financial means to transport the children back to Pennsylvania for time with Father. (*Id.* at 9–10).

¶ 13 Mother filed a timely appeal from the custody order, and now presents the following three issues for our review:

1. Whether the trial court committed an error of law and/or abused its discretion in refusing to allow Appellant to relocate with the parties' three children as: a.) such allowance would have been in the children's best interest; b.) Appellant demonstrated and proved the factors of *Gruber;* and c.) the court based its decision on the finding that neither party could afford the costs of transportation, but then placed all of the costs for transportation, except for the Christmas holiday, upon the Appellant?

2. Whether the trial court committed an error of law and/or abused its discretion in failing to award Appellant with [sic] primary physical custody of the parties' three children?

3. Whether the trial court committed an error of law and/or abused its discretion in failing to give the proper weight to all things that affect the "best interest" of the children in this case?

(Appellant's Brief at 4).

¶ 14 At root, all of Mother's issues challenge the factual findings and conclusions of the trial court and the weight assigned thereto. Because of this consistent theme and because of the close relationship between the custody and the relocation inquiries, we address all of Mother's issues together.

¶ 15 In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. *Johns v. Cioci,* 865 A.2d 931, 936 (Pa.Super.2004).

We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. *Id.* In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. *Id.* However, we are not bound by the trial court's deductions or inferences from its factual findings. *Id.* Ultimately, the test is "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Landis v. Landis,* 869 A.2d 1003, 1011 (Pa.Super.2005) (citations omitted). We may reject the conclusions of the trial court "only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *Hanson v. Hanson,* 878 A.2d 127, 129 (Pa.Super.2005).

¶ 16 With any child custody case, the paramount concern is the best interests of the child. *Landis, supra,* 869 A.2d at 1011. This standard requires a case-by-case assessment of all the factors that may legitimately affect the "physical, intellectual, moral and spiritual well-being" of the child. *Id.* (citations omitted). When a custody case includes a request by one of the parents to relocate with the child, then the best interest analysis must incorporate the three factors originally outlined in *Gruber v. Gruber,* 400 Pa.Super. 174, 583 A.2d 434 (1990). *See Landis, supra* at 1011 (reiterating that in a custody case involving relocation, the *Gruber* factors must be considered and applied "under the umbrella of the ultimate objective of determining the best interests of the child") (citation omitted). Specifically, under *Gruber,* the court must consider the following:

the potential advantages of the proposed move and the likelihood that the

move would substantially improve the quality of life for the custodial parent and the children and is not the result of a momentary whim on the part of the custodial parent;

\* \* \* \*

the integrity of the motives of both the custodial and non-custodial parent in either seeking the move or seeking to prevent it; [and]

\* \* \* \*

the availability of realistic, substitute visitation arrangements which will adequately foster an ongoing relationship between the child and the non-custodial parent.

*Landis, supra* at 1011–12 (citations omitted).

¶ 17 We emphasize that the *Gruber* factors, while important, are but one aspect of the overall best interest analysis that is required when the court is formulating a primary physical custody order as well as deciding a petition for relocation.

[I]t seems to appear that if a trial court merely applies the specified *Gruber* factors to a case in which it has not yet awarded primary physical custody to one of the parents, that court has abused its discretion. This is because the *Gruber* factors take into account only those best interest concerns related to relocation: a small corner of the best interest cosmos.

*Kirkendall v. Kirkendall,* 844 A.2d 1261, 1265 (Pa.Super.2004).

¶ 18 When, as in the case *sub judice,* there was no final custody order in place at the time that a parent filed a petition to relocate, then the trial court must scrutinize the custodial environment offered by each parent, without favoring one over the other, as part of the requisite best interest analysis. *Landis, supra* at 1012; *Kirkendall, supra* at 1265–66 (quoting *Marshall v. Marshall,* 814 A.2d 1226, 1230 (Pa.Super.2002)); *see also Thomas v. Thomas,* 739 A.2d 206, 211 (Pa.Super.1999) (*en banc* ).[5] In the absence of a pre-existing custody order, both parents stand on equal footing, sharing the burden of production and persuasion. *Landis, supra* at 1012 (citing *Hurley v. Hurley,* 754 A.2d 1283, 1286 (Pa.Super.2000)); *Burkholder v. Burkholder,* 790 A.2d 1053, 1058–59 (Pa.Super.2002) (citing *Hurley, supra* at 1286–87). In other words, when the court fashions an initial custody order under circumstances where one parent wishes to relocate, the relocating parent does not have a greater burden of proof with regard to establishing the best interest of the child than does the parent who does not intend to move.[6] *Hurley, supra* at 1286. The focus of the court must be on determining which parent and which living situation provides a familial setting that better serves the children's best interests. *Kirkendall, supra* at 1263–64; *Marshall, supra* at 1234.

---

**5.** Under the facts of *Thomas, supra,* an *en banc* decision from this Court, a custody order awarding equal shared custody to both parents was in effect when one parent filed a relocation petition. *Id.* at 208. The holding and the rationale of *Thomas* have subsequently been applied to cases in which no final custody order was in effect at the time of filing of a relocation petition. *See Landis, supra* at 1012; *Kirkendall, supra* at 1265–66; *Marshall, supra* at 1230.

**6.** *Gruber* placed the initial burden of production on the relocating custodial parent to show that the move was likely to improve significantly the quality of life for parent and child. *Hurley, supra* at 1286 (citing *Gruber, supra* at 440). However, "*Gruber* did not disturb the burden of persuasion that fell upon both parties and ultimately rested upon the traditional concept of the best interest of the child." *Id.* (citing *Gruber, supra* at 437).

¶ 19 With these principles in mind, we now address the issues in the case *sub judice*. We note first that the trial court articulated the correct standard for resolution of this case: the best interests of the children, incorporating the *Gruber* factors as well as all other relevant factors, and evaluating the custodial environments offered by both Mother and Father without imposing a selective burden of proof on Mother as the relocating parent. (N.T., 5/11/05, at 4, 6–8); *see Landis, supra* at 1012; *Kirkendall, supra* at 1265–66; *Marshall, supra* at 1230; *Hurley, supra* at 1286. However, although the trial court did articulate the correct standard, the record indicates that the court did not correctly apply it.

¶ 20 The trial court's statements and rationales indicate that it first decided the issue of relocation and then decided the issue of custody, based on its relocation decision. *See infra* (quoting N.T., 5/11/05, at 8–9). Nothing in our case law suggests that in cases such as this, where primary custody must be decided in the context of a relocation request, relocation should take a place of prominence and be the subject of an initial decision, which then leads inexorably to the custody decision. The trial court failed to scrutinize equally the custodial environment offered by Mother in Utah, and that offered by Father in Pennsylvania, without favoring one over the other. We are particularly disturbed by the court's conclusion that, if Mother resided in York, Pennsylvania, "we believe she would be the better parent for these children." (N.T., 5/11/05, at 22). We cannot understand how Mother's status as the better parent is dependent upon the location of her residence, and the trial court provided no rationale or factual findings to explain this conclusion. The trial court appears to have awarded primary custody to Father—in spite of *its own conclusion* that Mother was the better parent—based

on its separate and initial determination that relocation was not in the children's best interest. By dissociating the issue of primary custody from the issue of relocation, rather than keeping both inquiries under a single umbrella of best interests of the children, the trial court committed an error of law. We believe that the error was not harmless, as it appears to have led the trial court to draw some conclusions and inferences that were unreasonable, as described in detail below.

¶ 21 The trial court denied Mother's relocation petition and awarded primary physical custody of the children to Father based primarily on a single overriding factor: the children's need for consistency and stability in their residence, their school, and their neighborhood. (*Id.* at 18, 22). For several reasons, the certified record does not support the trial court's finding that Father offered a more stable custodial environment, nor its conclusion that the need for consistency in physical environment should be elevated over other factors.

¶ 22 First, in its consideration of stability, the trial court emphasized the physical environments of home and school and locale, but appeared to disregard its own conclusion that Mother had been the primary caretaker of the family. A child's sense of stability involves more than just physical structures and location; stability with regard to caregiver and patterns of care must also be considered. *See Johnson v. Lewis,* 870 A.2d 368, 372–73 (Pa.Super.2005); *Marshall, supra* at 1231 (both reviewing the primary caregiver doctrine which requires that, when conducting a best interest analysis, the court give positive consideration to the parent who has been the primary caregiver); *Wiseman v. Wall,* 718 A.2d 844, 851 (Pa.Super.1998) (reiterating that one parent's role as the

child's primary caregiver may be the determining factor in a custody determination).

¶ 23 The trial court indicated that Mother's role as the primary caregiver was "not a factor that greatly influence[d] our decision" because of the ages of the children. (N.T., 5/11/05, at 14). We find no support in the case law for this rationale. The ages of the three children at the time of the custody/relocation hearing were sixteen (16), thirteen (13), and five (5) years, respectively. This Court has applied the primary caregiver doctrine as a relevant factor in custody disputes for children well past very early childhood. *See, e.g., Johns, supra* at 940 (holding that the trial court abused its discretion in giving virtually no consideration to the mother's historical role as primary caregiver in a custody/relocation order regarding a twelve (12) year-old child); *Wheeler v. Mazur,* 793 A.2d 929, 935 (Pa.Super.2002) (giving consideration to the primary caregiver doctrine in the context of a custody dispute over two boys, aged twelve (12) and eleven (11), respectively). In failing to give weight to Mother's role as the primary caregiver merely because of the children's ages, the trial court erred.

¶ 24 While the trial court gave little weight to Mother's role as primary caregiver, it made no findings of fact from which it could reasonably have concluded that Father was, at that time, better able to assume the role of primary caregiver, a role which he had never before exercised. The trial court found that Father had provided little help over the years to Mother with regard to parenting responsibilities, and had not contributed much to domestic chores. (N.T., 5/11/05, at 12, 17). In addition, the trial court found that in the months leading up to the hearing, Father

"basically use[d] his mother to help care for the children."[7] (*Id.* at 11; *see also id.* at 17). However, there was *no* testimony whatsoever as to whether the paternal grandmother has the ability and/or the desire to continue to live with Father and the children and to continue to parent the children. She is sixty-eight (68) years old and she has her own residence, which she shares with the paternal grandfather, located five (5) hours away from Father's home. The paternal grandfather is seventy-three (73) years old, and there was scant testimony as to how much time he had spent at Father's home. Given the trial court's findings concerning Father's meager parenting activities when the family had been intact and the unknown factors concerning the paternal grandparents' potential future role, the trial court's disregard of Mother's role as primary caregiver is all the more unreasonable.

¶ 25 The second way in which the certified record fails to support the trial court's conclusion that Father offered a more stable custodial environment concerns the trial court's inference about Mother's living situation in Utah. The trial court inferred that Mother's relocation to her parents' residence in Utah was temporary; however, there was absolutely no evidence to support this inference. Despite the lack of evidence, the trial court placed great *weight on its inference of instability* in Mother's residence, as reflected in the following statements from the trial court:

> The *main factor* about mother's situation [in Utah] is that she would be living with her parents, which essentially sets up another temporary situation with the children. We are attempting to give stability to the lives of the children. A huge move to Utah and then another

---

**7.** Father acknowledged that his mother had lived with him and the children for all but

four or five days since the children returned from Utah. N.T., 4/25/05, at 70.

move at some indeterminate time in the future out of the mother's residence is not the best situation for these children to go into in order to give them stability in their lives.

\* \* \* \*

Again, the *primary factor* with regard to the [Utah] residence is that it would appear to be a temporary residence for mother and that is a *major factor* which we consider when deciding that relocation of the children with mother is not in their best interests at this time.

(N.T., 5/11/05, at 15–16 (emphasis added)).

¶ 26 There is simply no evidentiary basis for the trial court's inference that Mother's relocation was intended to be temporary. No testimony suggested that Mother viewed her relocation to Utah as a temporary solution that would be followed by another move in the foreseeable future. Mother planned to take a low-paying job and return to school in Utah. Both the prospective employment and the school were close to her parents' home. The maternal grandmother testified that she and the maternal grandfather had moved into the home approximately seven months before, with plans to retire there and no plans to move.[8] (N.T., 4/25/05, at 136–37). There was no evidence of record from which to conclude that Mother would relocate from her parents' home any time soon. Therefore, it was error for the trial court to conclude that Mother would provide an unstable situation for the children in Utah. The error was particularly egregious in light of the fact that the alleged instability in Mother's residence was the

*primary factor* in the trial court's determination that relocation was not in the children's best interest.

¶ 27 A third problem with the trial court's conclusion that Father offered a more stable custodial environment is the failure to consider the possible effect of Father's precarious financial situation. In its opinion, the trial court stated that "[a]bsent the bankruptcy situation, [Father] would appear to have the more stable residential situation." (N.T., 5/11/05, at 17). But it is impossible to evaluate fully the stability of Father's situation without considering the likelihood of his declaration of bankruptcy and/or mortgage foreclosure.[9] Father testified that, in the event that he were to lose his residence, he would move the family to Butler, Pennsylvania, which is a five hour drive from his residence in York, to live with his parents. (*Id.* at 65). There was no testimony from the paternal grandparents or anyone else as to whether relocation to Butler was a realistic or even feasible option. Given the uncertainties surrounding Father's finances and their possible implications for the family home, the trial court's conclusion that Father offered a more stable home environment than did Mother is unreasonable.

¶ 28 Finally, while the trial court inferred that a move to Utah would negatively affect the children, no evidence was offered to support this inference. The trial court placed great importance on stability, noting that the two older boys were average students and involved in school sports and scouting activities near their

8. The maternal grandmother was sixty-two (62) years of age and no longer working outside the home. The maternal grandfather continued to be employed as a pharmaceutical representative. Their average household income was approximately $120,000. (N.T., 4/25/05, at 133, 135–36).

9. The paternal grandparents have paid the majority of Father's mortgage payments during the past year. (N.T., 4/25/05, at 65, 81, 86).

current Pennsylvania home. (N.T., 5/11/05, at 13). While consistency in physical surroundings and day-to-day activities is a worthwhile goal of custody decisions, nothing in the record suggests that this factor should trump other laudatory goals with which it might conflict. The record neither supports nor explains the overriding importance which the trial court assigned to this goal.

¶ 29 For all the reasons discussed above, we determine that the evidence of record does not support the trial court's finding that Father could provide the most stable custodial environment, nor the determination that consistency of physical environment should be elevated to overriding importance, above that, e.g., of remaining with the primary caregiver in the children's young lives, their Mother. Therefore, we reject these conclusions as unreasonable.

¶ 30 We next consider the trial court's conclusions based on its analysis of the *Gruber* factors, which, as we have previously discussed, must be included as part of a best interest analysis in a custody/relocation case such as this. We determine that several of the trial court's conclusions from this inquiry were not supported by the evidence and thus were unreasonable.

¶ 31 Under the first prong of *Gruber*, Mother needed to show that her proposed move would substantially improve the quality of life for her and the children. While the trial court acknowledged that Mother's personal happiness and comfort would likely be increased by her move, it also concluded that the relocation presented no economic benefit to Mother. (N.T., 5/11/05, at 12–13, 21). However, there is no evidence in the record to support the trial court's conclusion that Mother's economic circumstances would not be improved by her move to Utah. Quite simply, Mother had a residence in Utah but none in Pennsylvania. In Utah, Mother was going to live with her parents in a four bedroom house.[10] In addition, the trial court found that her parents would be providing day-care for the children while Mother worked and returned to school. (N.T., 5/11/05, at 15). Given these benefits of housing and day-care provided by Mother's parents in Utah, the evidence of record clearly indicates that Mother's economic situation would, indeed, be *substantially* improved by her relocation. The economic benefits to Mother would also flow to the children, particularly in this situation where the evidence was overwhelming that the family had been struggling financially in Pennsylvania, to the point where the children had been required to deliver newspapers twice a day in order to provide additional funds for the household. Having an infusion of assistance from the maternal grandparents with regard to housing and day-care in Utah would assist Mother greatly in her plan to return to school and obtain a higher paying job in the future. The trial court's conclusion that no economic benefit would accrue to Mother and the children by relocating to Utah was unreasonable, as it ignored the evidence of the maternal grandparents' anticipated contributions.

¶ 32 Although the trial court did not specifically address the second prong of *Gruber*, i.e. the motivations of the parents in relocating or in opposing the relocation, there was no testimony or other evidence

---

10. The trial court commented that the maternal grandparents' four bedroom residence was "at best marginally adequate for the children" because at least two of the boys were going to end up sharing a room. (N.T., 5/11/05, at 15–16). We cannot accept the conclusion that a house is "marginally adequate" for the mere reason that two young brothers will be required to share a bedroom.

which indicated that the motivations of either Mother or Father were suspect. Mother's uncontested testimony was that she wanted to relocate so that she could provide a better, happier life for her children and herself. (N.T., 4/25/05, at 111–12). Therefore, this prong of *Gruber* is not implicated in the analysis and ultimate disposition of this matter.

¶ 33 The final prong of *Gruber* is the availability of realistic, substitute visitation arrangements. Mother proposed that if the children were permitted to relocate, Father would have custody during the summers as well as during half of the other breaks from school and half of the major holidays. The only concern that the trial court expressed with regard to these substitute arrangements was a financial one. As the court explained,

> [i]f we were to permit the children to relocate to Utah, we would be setting up a situation where mother would not have, in our opinion, the financial means to comply with the Court Order to get the children back [to Pennsylvania].

(N.T., 5/11/05, at 10).

¶ 34 The trial court concluded that the parties' precarious financial circumstances would be an almost insurmountable obstacle to regular visits. In the trial court's view,

> the very real prospect of mother not being able to afford to meet the Court's Order to have the children returned to father's partial custody for significant periods of time . . . greatly over weighs [sic] any benefit that the children would have or that mother would have relocating to Utah.

(*Id.* at 21–22).

¶ 35 While we agree that the parties' financial situation was precarious, the trial court's conclusion that their finances would preclude regular visitation was unreasonable.

¶ 36 The trial court's conclusion ignored testimony from the maternal grandmother that she would assume the financial responsibility for the children's trips between Utah and Pennsylvania. The grandmother testified as follows:

> [FATHER'S COUNSEL]: Are you prepared to pay [the cost of air fare] for the children to go back and forth to see their father?
>
> [GRANDMOTHER]: Yes.
>
> [FATHER'S COUNSEL]: How many times a year are you prepared to do that?
>
> [GRANDMOTHER]: I have no idea. Whatever is worked out is what will be taken care of.

(N.T., 4/25/05, at 145).

¶ 37 The trial court did not *mention* the grandmother's testimony at any point, referring only to Mother's testimony that her parents would help with transportation costs. (N.T., 5/11/05, at 10). The court emphasized its lack of enforcement power with regard to grandmother's promises of financial aid, but failed to explain why Father could not bring the matter before the court if Mother did not fulfill her court-ordered responsibilities with regard to transportation costs. By ignoring grandmother's testimony and all but assuming that Mother would fail to follow a court order with regard to visitation, the court drew an unreasonable conclusion that realistic substitute visitation arrangements were impossible.

¶ 38 Because the trial court's conclusions with regard to the first and third prongs of the *Gruber* test were not supported by the evidence of record, they were unreasonable and we decline to accept them. As we have explained above, contrary to the trial court's conclusion, the

evidence suggests that the *Gruber* factors, including the second prong, were satisfied.

¶ 39 While satisfaction of the *Gruber* factors militates in favor of relocation, the ultimate standard is still the best interests of the children, which requires evaluation of **all** factors relevant to the children's well-being. Many of the trial court's factual conclusions for which there *is* evidence of record support an award of custody to Mother. Most importantly, the trial court concluded that Mother had been the children's primary caretaker, that she had better parenting abilities, and that she would be the better parent. (N.T., 5/11/05, at 11, 14, 17, 22). The court found that Father had been of little help to Mother with regard to parenting responsibilities, and that at present he was relying on his sixty-eight year-old mother to help care for the children, the youngest of whom was then five (5) years old. (*Id.* at 11, 17). In addition, the court found that Father had degraded Mother in front of the children. (*Id.* at 11). These factors **all** militate in favor of a primary custody award to Mother.

¶ 40 In summary, for the reasons set forth above, we determine that the conclusions on which the trial court based its award of primary physical custody to Father are unreasonable. Accordingly, we reverse the trial court's order. Furthermore, the trial court's conclusions that *are* supported by the evidence of record militate in favor of an award of primary physical custody to Mother. Therefore, we remand to the trial court with directions that it grant primary physical custody of the children to Mother; that it grant Mother permission to relocate with the children; and that it devise a visitation schedule for Father.[11]

11. We have the option to decide the case on the merits when, as here, the record is suffi-

¶ 41 Reversed and remanded. Jurisdiction relinquished.

¶ 42 STEVENS, J. concurs in the result.

ciently developed. *See Wiseman v. Wall*, 718 A.2d 844, 851 n. 3 (Pa.Super.1998).