J-A07044-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| R. & L.E. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| S.B. AND J.W. | : | |
| | : | |
| | : | No. 1693 MDA 2019 |
| APPEAL OF: S.B. | : | |

Appeal from the Order Entered October 2, 2019
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2013-CV-4024-CU

BEFORE: OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY McLAUGHLIN, J.:           **FILED MAY 07, 2020**

S.B. ("Mother") appeals from a custody order granting R.E. and L.E. ("Great Grandparents") primary physical custody and Mother and J.W. ("Father") partial physical custody. Mother argues the court erred in making her custody contingent on the payment of Great-Grandparents' counsel fees, in making her custody contingent on Father's completion of directives, and in failing to apply the presumption in favor of parents in this custody action between parents and third parties. We affirm the award of custody but remand for the trial court to allow Mother's custody periods to resume before Mother pays Great-Grandparents' counsel fees.

Mother and Father have one child, A.W. ("Child"), born in July 2012. After Child's birth Mother, Father, and Child moved to the home of Great-Grandparents, who reside in Dauphin County. In 2013, Mother stated she

intended to move herself and Child from the home. Great-Grandparents filed a custody action, as they were concerned for Child's safety. In July 2013, the trial court granted the parties shared legal custody, but granted primary physical custody to Great-Grandparents and Father, who still resided with Great-Grandparents. Great-Grandparents were to supervise Father's custody time. Mother, who had moved to Blair County, had partial custody every weekend.

The custody terms were modified a few times, with minor changes. In August 2016, the parties entered into an agreed custody order, granting Great-Grandparents primary physical custody and Mother and Father each periods of partial physical custody. Legal custody was shared. In January 2017, following a custody hearing, the court entered a final custody order that provided that the parties had shared legal custody. Great-Grandparents had primary physical custody, and Mother and Father had partial physical custody every other weekend during the school year and a two-week vacation period for each parent in the summer.

Mother was directed to comply with a number of provisions including that she subscribe to and use Our Family Wizard, an information-sharing website for separated parties. Mother also had to maintain drug rehabilitation, attend group and individual counseling, undergo periodic drug tests and provide quarterly updates about test results to Father and Great-Grandparents, obtain counseling for anger, and enroll in a 12-week parenting program. The order had similar requirements for Father.

On August 21, 2019, Great-Grandparents filed an emergency petition for special relief asserting, among other things, that Mother had failed to return Child on Sunday, August 18. Great-Grandparents also filed a petition for contempt asserting Mother violated the prior court order by failing to return Child and in failing to comply with terms of the January 2017 order, including failing to use Our Family Wizard, undergo drug tests and provide quarterly updates, enroll in counseling for anger, and enroll in a 12-week parenting program.

The trial court granted Great-Grandparents' petition for emergency relief, directing Mother to return Child. It scheduled a hearing on the petition for contempt.

On August 26, 2019, Great-Grandparents filed a second emergency petition for special relief seeking immediate return of Child. Mother had failed to transfer custody as directed in the prior order. The court granted the petition and again directed Mother to return Child to Great-Grandparents. The court also suspended Mother's custody rights.

In September 2019, Mother filed an emergency petition for special relief and a petition for modification of custody, seeking primary physical custody. The Court denied the petition for special relief and scheduled a hearing for the petition for modification.

The court held a hearing on the petition for contempt and the petition for modification. The court summarized the testimony from the hearing:

I first heard testimony from Mother and Father regarding issues raised in Great-Grandparents' contempt petition filed on August 21, 2019. Mother testified that she initially signed up for Our Family Wizard but did not continue to stay signed up for Our Family Wizard for communication with Great-Grandparents because she believed that she and Great-Grandparents were getting along and communicating better without utilizing the program. Great-Grandparents alleged that they sent seventeen messages to Mother via Our Family Wizard, and Mother testified that she did not receive or respond to any of those messages. . . .

Mother testified that she has undergone drug rehabilitation, that she continues to go to drug rehabilitation once a month, and that she has been sober for a bit more than six and a half years. However, Mother had not provided Great-Grandparents with quarterly reports as required as to the progress on her drug rehabilitation.

Although Mother testified that she enrolled in counseling to address unspecified issues that she has, she admitted that she did not enroll in counseling to specifically address issues concerning anger and ongoing arguments between her and the Father. . . .

Mother completed Children First in Allegheny County, but the certificate of completion provided by Mother established that the course she completed was 4-hour separated parents course, rather than a 12-week parenting class. . . .

Mother and Father conceded that they did not return Child to Great-Grandparents on Sunday, August 18, 2019.

Based on the facts elicited from Mother and Father's testimony, I found both to be in contempt of various provisions of the January 30, 2017 custody order and parenting plan, and I relayed this finding to the parties on the record.

I then received testimony regarding Mother's petition for modification of custody filed on September 5, 2019.

Mother, who has had problems with drug addiction, testified that she has been seeking counseling and has been clean for nearly seven years. She is employed at a DirecTV call center and lives in a two-bedroom apartment in Altoona with

her other child, a 1-year old daughter. Mother testified that Child gets along well with the 1-year-old. Mother's mom, stepfather, and brother live nearby in Altoona, and Father's family lives in the Altoona area as well. Mother testified that she gets along pretty well with Father's family and believes that as Mother, she should have more time with Child, especially in the summer when Child is not in school.

Mother's primary means of communicating with Great-Grandparents is via text messaging. Mother testified that this had been a fairly effective method of communication, but in the last six months, this communication "hasn't been working out very well." Mother claims that the last several times she has called Great-Grandparents to speak with Child (when Child was in Great-Grandparents' custody), Great-Grandparents have denied her the opportunity to speak with Child. Mother also testified that Great-Grandparents have accused her of coaching Child to say certain things to a judge.

. . .

Almost all of Father's family lives in Altoona. Father has no family in Elizabethtown, Dauphin County other than his grandmother (who is Child's Great-Grandmother). . . .

Child's maternal grandmother (Mother's mom) testified that she has limited interaction with Great-Grandparents. The only interaction she has with Great-Grandparents is when she meets them at a Sheetz in Lewistown to exchange Child when Mother or Father are unavailable to do so. She testified that during the exchanges at Sheetz, Great-Grandparents do not talk to her at all. She has observed that when Great-Grandfather is present at Sheetz for the exchanges, Child will sit on his lap. Maternal grandmother finds this to be odd since Child is 7 years old and somewhat heavy. She also believes it to be odd that when she is watching Child in Altoona, Child will take off her shirt before running around and playing in the house.

Maternal grandmother believes that Mother is capable of raising Child since Mother raises a 1-year-old on her own, has her own apartment and vehicle, and has held the same job for two years. She also believes that Child would be better off living with Mother in Altoona because most of Mother and Father's relatives live in Altoona, whereas the

only relatives of Child that live in the Dauphin County-area are Great-Grandparents. She further testified that Child is happy and content when she spends time with Mother.

When asked on cross-examination about her criminal record, maternal grandmother admitted to having a DUI last April, for which she completed an ARD program. She testified that she also went to drug and alcohol counseling and continues to attend group meetings. She also admitted that twelve years ago, she was charged with filling a pain pill prescription that was in someone else's name.

Maternal grandmother acknowledged that at an August 2019 custody conciliation hearing, she was involved in a confrontation in which she approached Great-Grandparents, accused them of engaging in cruel behavior towards Child, and vowed to pursue avenues to end such behavior. She also recalled that on August 23, 2019, after I issued an Order directing Mother to immediately return Child to Great-Grandparents, the Great-Grandparents sat in their car for hours across the street from her (maternal grandmother's) house, allegedly looking into her window. She eventually approached Great-Grandparents' car and asked what they were doing.

Cross-examination of maternal grandmother also revealed that she recently accused Great-Grandfather of sexually assaulting Child, and that prior to that, she had accused Child's paternal grandfather of sexually assaulting Child. She acknowledged that both accusations were investigated by authorities and were both determined to be unfounded.

Dr. Jaeme Schwartz-Bogrette ("Counselor"), who owns Cocoa Counseling Center in Hershey and is Child's current counselor, testified that Child has been a client of Cocoa Counseling since February 2017. Child currently attends counseling once a week and is transported to the sessions by Great-Grandparents, who also pay for the sessions and are "extremely" involved in Child's counseling. She testified that Child is bright, kind, gentle, and energetic. She has been working with Child on issues of self-regulation and self-disclosure and plans to also work on issues of self-esteem, self-identity, and empathy. Dr. Schwartz-Bogrette has diagnosed Child with oppositional defiant disorder, generalized anxiety disorder, and post-traumatic stress

disorder. [On cross-examination, Counselor testified that the PTSD stemmed from "the trauma from being removed from parentals," and clarified that it was not from losing her parents, but from "[b]eing taken from a parental unit." N.T., 9/27/19, at 61.]

Counselor testified that Child behaves differently immediately after she spends time with Mother and Father Specifically, she has noticed that after having contact with Mother and Father, Child displays an increase in self-negativity, swearing, and aggression. Counselor observes, for example, that when Child is drawing, she will harshly break down on the pencil, break the pencil, and draw on herself. According to Counselor, this type of behavior is often [a] mark[] of a child experiencing trauma and raises concerns about future self-harm. She believes that changes in the dynamics of Child's visitations with Mother and Father are necessary to avoid continuation of this behavior.

Counselor recalled that Child recently told her about a visit at Father's house which seemed to be uncomfortable for Child. Child relayed to Counselor that she (Child) was visiting Father's house on September 17, 2019 when Mother stopped by with her 1-year-old daughter. According to Counselor, Child seemed surprised to see Mother at Father's house and seemed to believe that Mother was not supposed to be there.

When asked about the maternal grandmother's sexual assault allegations against Great-Grandfather, Counselor testified that she has seen nothing that would lead her to believe that Child was sexually or physically abused by Great-Grandfather. Moreover, she testified that she believes Child is 100 percent safe in Great-Grandparents' home. She has observed that Great-Grandparents are loving, caring, and protective with Child and that there is a "bond of connection" between them. Counselor believes that it would "not at all" be in Child's best interest to grant primary custody to Mother and prevent Great-Grandparents from having contact with Child.

Child's former kindergarten teacher ("Teacher") testified that Child was very respectful and that Great-Grandparents always insisted that Child have good manners. She observed that Child was very happy when she was with Great-

Grandparents, but she also recalled that Child would sometimes exhibit an anxiousness on Mondays that would dissipate by midweek. She recalled that on a number of occasions, she asked Child whether she was going to Mother's house for the upcoming weekend, and Child's response would be a "very strong no."

Teacher testified that Child was far above average academically, especially in the areas of grammar and writing, and she believed that this was largely because Great-Grandparents always ensure that Child completed her schoolwork. She recalled that Great-Grandparents were heavily involved in Child's education and that they would often bring items (such as snacks and coats) to the school for less fortunate children who could not afford these items. She testified that Great-Grandparents always attended parent-teacher conferences, asked questions, and were willing to work with Child on areas that needed improvement. Mother and Father did not communicate with Teacher about Child's progress in school, nor did they attend parent-teacher conferences. According to teacher, Child's homework was always completed when she was in the custody of Great-Grandparents, but sometimes when Child was in Mother or Father's custody, Child's homework was not completed.

Teacher testified that although Child was quiet, she had a lot of friends. Teacher also recalled that Great-Grandparents often took a less fortunate child with them when they went to events with Child and that this helped Child develop friendships with many children.

Great-Grandparents (Great-Grandmother, who is 71 years old; and Great-Grandfather, who is 74 years old) live in Elizabethtown with their 50-year-old son (Child's paternal grandfather).[1] Great-Grandparents' home contains three bedrooms, two bathrooms, a kitchen, a living room, a computer room, and a toy room. Great-Grandmother testified that Child sleeps in Great-Grandmother's room, but Child has her own bed in that room. She noted that if Child slept in her own room, the room would be on the far side of

---

[1] Child's paternal grandfather only "partially" lives with Great-Grandparents. N.T., 9/27/149, at 75.

the house, and Great-Grandmother would be unable to hear if Child got up in the middle of the night. Great-Grandfather sleeps in a different room than Great-Grandmother and Child. Great-Grandmother testified that Child enjoys staying at Great-Grandparents' house where Child has a hermit crab, a fish, a dog, a cat, and is surrounded by various farm animals. Child also has her own pool, swing set, trampoline, two toy houses, a princess carriage, and two bicycles.

Great-Grandmother testified that she is retired, in good health, and is able to take care of Child's physical, mental, and emotional needs. She bathes child, takes Child to all appointments, and partakes in other recreational activities with child, including swimming, cooking, shopping, and trips to parks and amusement parks.

When in the custody of Great-Grandparents, Child attends school Monday through Friday and sometimes attends counseling right after school. Great-Grandmother testified that she and her husband attend all of Child's parent-teacher conferences and that neither Mother nor Father have attended any of Child's parent-teacher conferences from preschool through first grade. She further stated that Child does well in all school subjects except for math, for which Great-Grandparents have hired a tutor for Child. Child has several friends in the Elizabethtown area, and she has an aunt that lives in the Elizabethtown area, whom she sees five to six times a week.

Great-Grandmother testified that subsequent to the August weekend on which Mother did not return child to Great-Grandparents, Child missed the Monday and Tuesday of the following school week, which happened to be the first two days of second grade. Child currently attends Conewago Elementary School, but Great-Grandmother testified that Mother had previously attempted to enroll Child in school in Altoona without having permission to do so. According to Great-Grandmother, Mother's failure to return child on the one weekend in August arises out of an August conciliation conference that was held pursuant to a previous contempt petition filed by Mother. Great-Grandmother stated that all the charges in Mother's contempt petition were dropped following the conciliation conference, and she believes that this is the point at which Mother and Father decided not to return Child to Great-Grandparents.

[2] In that petition, Mother alleged that on one Friday in January 2019, Great-Grandmother refused to bring Child to the Lewistown Sheetz for a weekend custody exchange. Great-Grandmother testified that she did not bring the Child to the Sheetz on the date in question because there was a snowstorm that day.

Great-Grandmother communicates with Mother and Father through text messaging, and she will also speak with them at the weekly custody exchanges at Sheetz, at which point they usually discuss Child's homework and other school-related matters. She testified that she signed up for Our Family Wizard in February 2017 and has maintained her subscription to said program, but neither Mother nor Father have responded to any of the messages she has posted on the program over the last two years.

Great-Grandmother testified that she notifies Mother and Father of Child's medical appointments, but neither Mother nor Father come to Child's appointments, nor does she believe that they have accessed Child's medical records. She recounted two notable medical events involving Child, both which occurred when Child was in Father's custody. In one event, Child's fingers were smashed in a house door, and Child needed a splint for a broken finger. In the second event, Child was in Father's car when it rolled down a hill. According to Great-Grandmother, Father refused to seek medical treatment for Child following the car incident, so Great-Grandparents took Child to the hospital by ambulance. Great-Grandmother testified that she and her husband recently secured medical insurance for Child because Mother and Father never did so.

. . .

Great-Grandmother also discussed her concerns about Mother having custody of Child. She testified that Mother is irresponsible, and first-grade journal entries written by Child (provided by Great-Grandmother's counsel) recounted occasions on which Child had been left to feed and care for Mother's 1-year-old or on which Child had been left home alone with the 1-year-old. She also expressed unease over the fact that Mother's boyfriend and stepfather recently attempted to show Child how to shoot a B.B. gun.

Great-Grandmother is also concerned that if Mother is granted primary custody of Child, maternal grandmother would have to watch the child when Mother is at work. She testified that when Child is in the care of maternal grandmother, Child has to sleep in the same bed with maternal grandmother. She also relayed apprehension about maternal grandmother's volatile behavior, recounting several recent incidents. She recalled that at a recent custody conciliation conference, maternal grandmother came up to her outside of the conciliation room and repeatedly threatened her verbally by telling her (Great-Grandmother) that she was "going down." She also recalled that on the same occasion, maternal grandmother looked in Great-Grandfather's face and referred to him as the devil. Great-Grandfather told maternal grandmother to stop talking to him, but she continued to talk. According to Great-Grandmother, a sheriff was summoned to stand outside the custody conciliation room until the conference was over.

Great-Grandmother additionally recalled the occasion on which she and her husband went to Altoona to retrieve Child after the issuance of the court's August 23, 2019 Order directing Mother to immediately return Child to Great-Grandparents. She recalled that while she and her husband were waiting in a parking lot for the Sheriff's office to arrive for a wellness check, maternal grandmother drove child around the block, came back, and then approached Great-Grandparents' vehicle. Maternal grandmother then proceeded to scream and curse at Great-Grandparents, accusing Great-Grandfather of sexually assaulting child, taking pictures of their vehicle and license plate. Great-Grandmother testified that she is concerned for Child's safety around maternal grandmother.

Great-Grandmother also recounted four sexual assault allegations made by the maternal grandmother, all which were ultimately determined to be baseless. Of the allegations recounted were the allegations against Great-Grandfather and Child's paternal grandfather discussed above. A third allegation was lodged against Great-Grandmother's grandson (Father's brother), but an investigation revealed that the accused was in prison at the time of the alleged assault, and, therefore, the allegation could not have been truthful. The fourth allegation was raised against another one of Great-Grandmother's

grandsons; however, this allegation crumbled when an investigation revealed that the accused grandson was in fact living in Tennessee.

Great-Grandmother believes that she and her husband should be making all decisions for Child because it can be difficult to get in contact with Mother and Father when certain decisions need to be made and because Mother and Father typically have not been involved with Child's schooling and medical appointments. Regarding a physical custody schedule, Great-Grandmother believes that it would be in the best interest for Mother and Father to drive down to the Dauphin-County area to see Child and possibly take her to the Elizabethtown Library to help Child with schoolwork. Great-Grandmother believes that Child could go back to spending alternating weekends in Altoona with Mother and Father once Mother and Father "improve themselves."

Trial Court Opinion, filed Nov. 13, 2019, at 4-13 ("1925(a) Op.") (citations to record omitted).

Following the hearing, the court applied the custody factors and awarded primary custody to Great-Grandparents, with partial physical custody to parents every other weekend and two weeks for each parent in the summer. The court also ordered that, for one evening each week, Mother and Father could take Child to the library and dinner. The order provided that Mother's and Father's custody periods would begin after Great-Grandparents' counsel fees were paid and upon "proof of abiding by" the directives of the prior order:

The weekend following completion of payment to [Great-Grandparents'] counsel under the Contempt Order issued September 27, 2019, and proof of abiding by Paragraphs 61, 83, 85, 86, 87 and 88, Mother and Father shall have partial physical custodial responsibilities of the child.

Order, dated Oct. 2, 2019, at ¶ 11.

Mother filed a timely Notice of Appeal. She raises the following issues for our review:

> 1. Did the Court abuse its discretion in the conditions that the Appellant had to pay the opposing parties [counsel] fees as a condition of the restoration of her custody rights?
>
> 2. Whether trial court abused its discretion in placing conditions on the restoration of Mother's custody rights on the actions of individuals, mainly those of the Father over whom she has no control.
>
> 3. The Trial Court abused its discretion in not following 23 [Pa.C.S.A.] § 5327 when determining primary physical custody in this matter.

Mother's Br. at 8 (proposed answers omitted).

Mother first argues that the court erred in making the restoration of her custody rights contingent on the payment of Great-Grandparents' counsel fees. The trial court agreed, acknowledging that "payment of [counsel] fees to [G]reat-[G]randparents has no bearing on Child's best interests." 1925(a) Op. at 17. We agree and remand so that the trial court can amend its order to remove this provision. *See* 23 Pa.C.S.A. § 5328(a) (noting the court shall award custody by "determin[ing] the best interest of the child by considering all relevant factors").

Mother next argues that the court erred by directing that the restoration of her custody rights were contingent on Father completing certain actions, as she has no control over [Father's] actions.

The Order provided:

> The weekend following completion of payment to [Great-Grandparents'] counsel under the Contempt Order issued

- 13 -

> September 27, 2019, and proof of abiding by Paragraphs 61, 83, 85, 86, 87 and 88, Mother and Father shall have partial physical custodial responsibilities of the child.

Order, dated Oct. 2, 2019, at ¶ 11.

The trial court stated that it did not intend to impose a condition which made restoration of Mother's custody rights dependent on Father's compliance with the order. 1925(a) Op. at 18. It stated that it "intended to set forth specific actions that each parent must take in order to restore their own respective custodial rights." *Id.* It concluded Mother's claim is "unfounded" as "that was not [the court's] intention in imposing the condition." *Id.*

In her brief, Mother states that "[g]iven that the court will only require Mother's compliance to the Order, the Appellant deems this issue resolved." Mother's Br. at 29. She has therefore abandoned this issue.

In her final issue, Mother argues that the court abused its discretion in failing to determine custody based on the statutory presumption that as between a parent and a nonparent, the parent is entitled to custody. Mother argues that Great-Grandparents did not present the requisite clear and convincing evidence to overcome the presumption. She argues that Child's therapist attributed Child's PTSD and anxiety to the "trauma of being taken from" her parents and provided no basis for her opinion that Mother should not have primary custody. Mother's Br. at 31-32 (quoting N.T., 9/27/19, at 61). She notes that Child's tutor testified that Child did not complete her homework when in Mother's care, but also said that she never attempted to contact Mother regarding this issue. Mother also notes that Great-

Grandmother interpreted a drawing by Child to conclude Child was not being properly cared for, but also stated that "it's a little girls' imagination. But everything else is--." ***Id.*** at 32.

We review a custody order for an abuse of discretion. ***G.A. v. D.L.***, 72 A.3d 264, 268 (Pa.Super. 2013) (quoting ***Collins v. Collins***, 897 A.2d 466, 471 (Pa.Super. 2006)). We must accept a trial court's factual findings when the record supports them, and we defer to the trial court's credibility determinations. ***Id.*** We must determine "whether the trial court's conclusions are unreasonable as shown by the evidence of record." ***Id.*** (quoting ***Collins***, 897 A.2d at 471). We will reject the trial court's conclusions "only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." ***Id.*** (quoting ***Collins***, 897 A.2d at 471).

The Custody Act requires a trial court to consider all of the Section 5328(a) best interests factors when "ordering any form of custody." 23 Pa.C.S.A. § 5328(a). A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." ***R.L. v. M.A.***, 209 A.3d 391, 395 (Pa.Super. 2019) (quoting ***S.W.D. v. S.A.R.***, 96 A.3d 396, 401 (Pa. Super. 2014)). A trial court does not need to explain its decision in detail; rather "all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***Id.*** (quoting ***M.J.M. v. M.L.G.***, 63 A.3d 331, 336 (Pa. Super. 2013)).

In child custody cases, the paramount concern "is the best interests of the child." *Id.* (quoting *C.G. v. J.H.*, 193 A.3d 891, 909 (Pa. 2018)). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *Id.* (quoting *M.J.N. v. J.K.*, 169 A.3d 108, 112 (Pa. Super. 2017). The custody factors to be considered include:

**(a) Factors.--**In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1)-(16).

Further, Section 5327 of the Custody Act provides, "[i]n any action regarding the custody of the child between a parent of the child and a nonparent, there shall be a presumption that custody shall be awarded to the parent. The presumption in favor of the parent may be rebutted by clear and convincing evidence." 23 Pa.C.S.A. § 5327(b). Clear and convincing evidence is "evidence that is so clear, direct, weighty, and convincing so as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth

of the precise facts in issue." ***R.L.***, 209 A.3d at 396 (quoting ***M.J.S. v. B.B. v. B.B.***, 172 A.3d 651, 660 (Pa. Super. 2017)). Therefore, before the proceedings begin, "the evidentiary scale is tipped, and tipped hard, to the biological parents' side." ***Id.*** (quoting ***V.B. v. J.E.B.***, 55 A.3d 1193, 1199 (Pa.Super. 2012)). Further, before making a decision to award primary physical custody to a nonparent, the trial court must "hear all evidence relevant to the child's best interest, and then, decide whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side." ***Id.*** (quoting ***V.B.***, 55 A.3d at 1199).

Here, the trial court stated that it applied the presumption in favor of awarding custody to a parent, rather than a third-party, but that there was a "plethora of clear and convincing evidence to rebut the presumption of parental custody and to establish that it is Child's best interest to remain in primary physical custody of Great-Grandparents." 1925(a) Op. at 19. The court explained its application of the custody factors as follows:

> I'll now go through the custody factors concerning custody. The grandparents will retain legal custody. They have to be sure that the doctors and nurses and school know that they can provide information to Mom and Dad, but the legal decisions, the decision making is only with them.
>
> As far as school schedules, they can get the school schedule on the website. You should post when the regular well visits are on Family Wizard.
>
> You have to start posting more.
>
> But you have to start reading it.
>
> Obviously, [Great-G]randparents . . . did permit the frequent and continuing contact up until the point when we

- 18 -

had to get the state police and the sheriffs involved to return the child.

I understand it's not Mom and Dad's fault that these allegations -- false allegations keep getting filed, but you have to abide by the court order. And you didn't, even though you received repeated directives from counsel and the Court that that was to be done.

The next factor concerns the present and past abuse committed by either party or a member of the party's household. . . .

I'm also very concerned about the assaultive behavior of Mom's mother, her aggressive behavior in the courthouse and elsewhere. So we will not allow any unsupervised visits with grandmother.

In other words, you need to be in the child's presence all the time. The child cannot be left alone with your mother. This behavior is unacceptable.

Obviously, the parental duties performed by each party on behalf of the child, the child has been taken care of by [Great-G]randparents since birth. The child needs stability in her education and community life and continuity, of course, she shall remain with [Great-G]randparents. At prior times, we'd hoped things would've changed, but they haven't.

The ability of extended family. Obviously, there is extended family for everybody around to help. The child's sibling relationship. There is a one-year-old baby in Mom's house, and the child will see her sister at that time.

The child is only seven and has been through a lot of trauma, so we're not considering the factor of preference of the child based on the child's maturity and judgment.

The attempts of a parent to turn the child against the other parent, obviously, Mom and Dad are getting along as well as they can be. And I don't see any efforts of the Mom or Dad to keep the child from each other, nor do I see [Great-G]randparents trying to turn the child against the things Mom and Dad have done. So that's not an issue.

Which party is more likely to maintain a consistent, nurturing relationship adequate for the child's emotional needs. . . .

Mother, I think, would like to maintain a home adequate for the child's needs. But at the current time, this certainly leans 99 percent in favor of the [Great-G]randparents. I would hope that things continue to get—continue to do well for Mother. I'm glad she has been clean and sober for seven years. I'm glad she's had a stable employment for a couple of years. I'm glad she's got a nice apartment that is good for the child and her additional child, but because of the proximity of the parties, two and a half hours apart, Altoona, during the week going to school is going to have to be with [Great-G]randparents.

All of the parties are able to make arrangements to take care of the child, at least [Great-G]grandparents. . . .

Mother has – she's got [Father's] family and her brother. Her mom is certainly not available. But she does have other people. But clearly, the retired [Great-G]randparents have the most, in addition to the assistance of Aunt Tina.

The level of conflict between the parties is high.

The history of drug and alcohol abuse. We have a substantial drug history of Mother, although we are very happy and proud of her that she's been substance free for seven years. . . . [Great-]Grandparents have no history of drug or alcohol abuse.

The mental and physical condition of a party or a member of a party's household. . . . Obviously, [Great-G]randparents are totally fine.

The other relevant factors would be the fact that the child is stable, has been in this school, has a wonderful situation. Obviously, the goal is to have parents raise their children, not the [Great-G]randparents. And we had hoped that the last time, but things have fallen apart.

I know Mom can't control her mother, but after four unfounded, unbelievable allegations of sexual abuse when people aren't even around to do it -- like, they're in prison or in Tennessee -- you have to understand creates trauma

for the child. And the behavior of your mother is just simply unacceptable.

The swearing has to stop. Kids repeat things, and it just looks bad for you when they come back and start swearing and carrying on like that. It's just bad for the child. As it is, the child is dealing with a lot of anxiety.

I will say that once Mom gets into counseling, I think it will be very important for her counselor and the child's counselor to communicate to see if they can come up with some things that might be helpful to fix things. . . . And maybe they can fix what they can fix there.

. . .

And hopefully, they will attend the parent/teacher conferences, and hopefully they'll attend the well visits, and hopefully they'll start participating as best as they can in their child's life a little better and maybe in another year or two or three things will continue to improve.

Many people are very physically and mentally vital well into their 90s. My guess is you will too, hopefully. Nevertheless we need some more heavy lifting from the parents when we get this worked out a little better. But we're very happy this Mom is doing so much better. But what just happened in August just sort of blew everything up.

N.T., 9/27/19, at 116-122.

The trial court concluded that granting primary custody to Mother "would place Child in an environment that would be detrimental to Child's overall well-being in a multitude of ways," 1925(a) Op. at 19. It reasoned:

Mother has a substantial history of drug and alcohol abuse, although she has commendably been substance free for seven years. Unfortunately, living with Mother would likely expose Child to a substantial amount of contact with Mother's Mom (Child's maternal grandmother), who has shown a pattern of extremely volatile and unacceptable behavior, ranging from significant vindictive altercations with Great-Grandparents to the repeated concoction of spurious sexual assault allegations against Great-

- 21 -

Grandparents and other members of their family. Moreover, Mother, like Father, has contemptuously ignored various provisions of this Court's previous custody Order of January 2017, including a failure to communicate with Great-Grandparents via Our Family Wizard, a failure to communicate with Great-Grandparents regarding the progress of her drug rehabilitation, a failure to complete a 12-week parenting class, a failure to enroll in counseling for anger issues. Last, but not least, Mother failed to return Child to [Great-Grandparents] for a scheduled custody exchange, ultimately necessitating the substantial involvement of law-enforcement to assist in enforcing my Order to return the Child to Great-Grandparents.

*Id.* at 19-20.

The court also concluded Child was thriving in Great-Grandparents' care,

reasoning:

Child has been well nurtured by her Great-Grandparents since she was born and has been thriving in their custody. Great-Grandparents are retired and in good health and have devoted themselves to caring for Child's emotional, physical, and academic needs. Great -Grandparents provide Child with a safe, stable home environment, they expose her to various recreational activities, and they tend to all of her medical needs. Moreover, they are thoroughly involved in Child's schooling, and Child is thriving academically and socially. Great-Grandparents ensure that her schoolwork is always completed and that she gets assistance with any areas in which she may be struggling. Child is very young and has become accustomed to the stable educational situation and community in which she has been living. It would be strongly inadvisable to remove Child from this stability which has helped her thrive to this point, especially when she would be removed to an environment in which she would likely be surrounded by more volatility and individuals whose behavior and irresponsibility would present a substantial threat to Child's emotional, academic, and physical well-being.

*Id.* at 20.

We conclude that the record supports trial court's factual findings and credibility determinations and that the court did not abuse its discretion in issuing its custody order. The court applied the presumption in favor of parents but concluded that the Great-Grandparents had presented clear and convincing evidence that it was in Child's best interest to remain in Great-Grandparents' primary custody. We cannot conclude this was an abuse of discretion. Child has resided with Great-Grandparents since birth and is doing well in their care. Mother has made great strides but has not complied with the court order and has not made an effort to be involved in Child's school and health decisions.

Case remanded to remove provision requiring payment of counsel fees prior to reinstating Mother's right to exercise custody. Order affirmed in all other respects. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/7/2020