J-A07020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| JANINE VICALVI F/K/A JANINE SINCK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2150 EDA 2021 |
| CHAD A. FLAKKER | : | |

Appeal from the Order Entered September 22, 2021
In the Court of Common Pleas of Lehigh County Civil Division at No(s):
2014-C-0333

BEFORE:  DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MAY 3, 2022**

J.V. ("Mother") appeals from the order awarding sole legal custody of G.F. ("Child"), born July 2011, to C.A.F. ("Father") and denying her petition for contempt. We conclude the court did not abuse its discretion in awarding sole legal custody to Father and in denying the petition for contempt. We therefore affirm the order.

This custody case was initiated in 2014. The parties have had shared legal and physical custody of their non-verbal, autistic child since October 2016. In December 2020, Mother filed a petition for contempt. Father filed an answer to the petition for contempt, a counterclaim for contempt, and a petition for modification of the custody order, seeking sole legal custody. The court held a three-day hearing, at which both parties sought sole legal custody.

Mother presented Nicole Viscomi as a witness. Viscomi was the attorney who represented Mother at Child's individualized education plan ("IEP") meetings and other school meetings. Viscomi testified that she had an opportunity to observe interactions between Mother and Father. She testified that Father had a "continual insistence of being the opposite of [Mother] [and] there [did] not seem to necessarily be a basis in fact to the things that he advocates for." N.T., 5/21/2021, at 23-24. Viscomi testified that Father was "very disparaging with [Mother] and had an awful lot to say about what she was or wasn't, which really had nothing to do with the task at hand in the IEP meeting." *Id.* at 27. Viscomi also testified that when she and Mother arrived at a scheduled IEP meeting, they learned that the school had rescheduled the meeting, which had occurred earlier that day. *Id.* at 24. She testified that she and Mother requested a meeting after reviewing the IEP, but no meeting was held. *Id.* at 26

Two individuals who worked with PA Mentor, which is an organization that provided services to Child – Dorothy Bednarski and Nicole Hadeed – also testified.

Bednarski was Child's behavioral specialist from October 2019 to March 2021 and she briefly returned in the spring of 2021. N.T., 6/11/2021, at 6-7, 18. She provided wrap-around services and worked with Child for approximately 3 hours per week. *Id.* at 7-9. Bednarski testified that Mother intimidated her when they first met, but "in a good way," because Mother was "so knowledgeable about the Autism diagnosis, about the Autism community

at large, about services, about applied behavioral analysis." *Id.* at 10. She further testified that Mother is "fully engaged in [the] session[s]." *Id.* at 11. Ms. Bednarksi testified that Father is a "fierce advocator" for Child and Father and Child have an "awesome relationship." *Id.* at 12. She testified that both parents do what is best for Child and that they have different approaches, but "are equally important and equally effective." *Id.* at 13. Bednarski testified she learned from Mother, Mother is an advocate for her son, and Child made progress with Mother. *Id.* at 21. In addition, although Father did not have the same level of knowledge regarding Autism as Mother, Child made progress, and was more focused, with Father. *Id.* at 22.

Bednarski further testified that during the sessions with Child, Mother would be "very, very frustrated about the way things were going with [Father]." *Id.* at 17. Father was "not as vocal about his frustrations with [Mother]." *Id.* Father did not disparage or attack Mother but, before Bednarski stopped provided services, Father was "beginning to vocalize his frustration finally with [Mother] during the session[s]." *Id.* at 18. Bednarski testified that she left the case because "the focus became more on the relationship between the parents than it did the focus on [Child]." *Id.* She testified that the "case has always been difficult to put staff in because of the parents' relationship with each other that at times it's so intense that you go to provide a session and you can't get past that because they're so frustrated." *Id.* at 19. She found "both parents to be a barrier to treatment." *Id.*

Bednarski also testified about a text exchange with Mother, where Mother stated that Bednarski and other care providers were engaging in insurance fraud because they were attending gymnastic sessions with Child at Parkettes. *Id.* at 30-31. Ms. Bednarksi testified it made her "very uncomfortable because [she] take[s her] billing very seriously" and the text insinuated she was being complacent in, or participating in, fraud and abuse and she therefore exited the case. *Id.* at 31. She stated it "was not fraud, waste, or abuse" to attend the Parkettes sessions and the interventions at the program were legitimate and in the bounds of treatment. *Id.* at 32. She stated she left the case the first time due to the insurance fraud allegations.[1] *Id.*

Bednarski testified that the benefits of the class at Parkettes included prompting, modeling, shaping, working to keep escape behaviors at bay, prompting social interactions with peers, and prompting better listening and compliance. *Id.* at 29-30. She however also testified that, after some sessions, she did not think gymnastics was the best use of the therapy time because the worker was on the floor alone with Child. Therefore, the worker's role became more physical than the prompting, modeling, and shaping that were supposed to be the support roles. *Id.* at 43. When Ms. Bednarksi informed Father that they would not be attending the class anymore, it was the first time she felt intimidated in his home. *Id.*

---

[1] Bednarski left the case, returned briefly, and then left again.

Hadeed testified she was a behavioral health technician and was involved in Child's care for approximately 9 to 10 months. *Id.* at 52. She stepped down because she felt uncomfortable going to Mother's house, where she felt criticized by Mother. *Id.* Child was Hadeed's first non-verbal child. Child was engaged and focused during the sessions at Father's house. *Id.* at 54. At Mother's house, Child was more easily distracted and it was difficult to bring him back to the table. *Id.* Child, however, was making progress at both homes. *Id.* at 56.

Hadeed also testified about the Parkettes class. She thought providing services at the Parkettes class was beneficial because Child was learning social skills. *Id.* at 58. Hadeed would redirect him and prompt him and help with stretching. *Id.* However, she testified that after some sessions she and her supervisor decided it would be best to do two sessions at Father's house, rather than one session at Father's house and one at Parkettes. *Id.* at 68.

Hadeed testified that Mother and Father had different goals for Child. Mother wanted Child "to learn letters, numbers, alphabet, [and] counting." *Id.* at 69. Father wanted Child to learn those things as well as "more basic life skills like zipping up your coat [and] buttoning up your shirt." *Id.* Hadeed further testified that she had a curriculum for Child and would enter the session at Mother's house "wanting to focus on certain things, but [Mother] provided different resources when [Hadeed] got there." *Id.* at 70.

Father's mother, M.F. ("Grandmother"), testified. In October 2020, Child did not have an aide at school, even though he needed one pursuant to his

IEP. *Id.* at 79-80. Grandmother went to the agency, which was short of people, and was hired as an assistant to the teacher's aide for Child. *Id.* at 80, 98. She helped Child stay focused, eat lunch, and use the bathroom. *Id.* at 81-85. She worked as an aide for nine days, but the company did not allow her back after those nine days because Mother objected. *Id.* at 81, 90-81. Child did not have an aide after she left. Grandmother returned in April and May of 2021 as an aide for Child through a different agency, again without Mother's consent, and would attend when the agency called. *Id.* at 103-04. Grandmother testified that she only applied for the position because the school did not have aides available for Child. *Id.* at 104-05.

Father also testified. He stated that Bednarski left Child's case after Mother's text message regarding insurance fraud. N.T., 7/6/2021, at 114-17. He further testified that Mother changed the days Hadeed would come to his home without discussing it with him because Mother did not want Hadeed there on Wednesday, which was the day Child attended Parkettes. *Id.* at 129-30.

Father also discussed Child's appointments. He testified that he usually makes the phone calls and does the "leg work" for scheduling therapies for Child. *Id.* at 180. He stated that Mother "suggests stuff," but "[i]t usually comes down to [him] receiving the calls, scheduling the dates, and communicating back with Mother about time and dates and confirming." *Id.* at 180-81. He testified that Mother did not attend Child's January 2021 doctor appointment and that she arrived late to an occupational therapy appointment

in May 2021. *Id.* at 132-33, 205-06. For the OT appointment, Father sent a text regarding a tentative appointment on May 5 at 1:00, and Mother responded that it "[s]ound[ed] great," and he confirmed the appointment with the office. *Id.* at 205-06. On the day of the appointment, Mother showed up late with Child. When Mother had not yet arrived, Father texted her and asked whether she would bring Child, and she stated that, "As far as summer goes, I see no need for OT at this time." *Id.* at 206. He testified that "[t]here was a whole scene at [the office] and [Mother] stomped out," as she did not think Child needed to do OT over the summer. *Id.* at 207-08. He stated Mother often disagreed with treatment providers. *Id.* at 208.

Father further testified that at the last GI appointment, the doctor said Child did not have to return unless there was a future problem. *Id.* at 136. He denied Mother's claim that the GI specialist did not want to see Child anymore because Father had refused to give prescription medication. However, Father stated he did not give the calorie booster when Child was in his care. *Id.* at 136-37. Father further testified that the pediatrician has not recently recommended a visit to a GI specialist and Child did not have stomach problems when in Father's care. *Id.* at 139.

Father further testified about a dentist appointment "a few years back." *Id.* at 179. He stated Mother was "very disheveled and smelled heavily of alcohol and cigarettes" at the appointment. *Id.* She appeared intoxicated. *Id.* He stated that when the dentist asked permission to extract two of Child's molars, Mother was "sleeping on the chair," so he went back and discussed it

with them. *Id.* at 180. On cross examination, Father was asked whether he was "aware that [Mother] had [Substance Abuse Screening Services, Inc.] testing the following day and it was negative," and Father responded, "Wow. Surprising." *Id.* at 202-03.

Father next testified about Grandmother acting as an aide for Child at school. He testified that at the start of the school year, Child did not have a classroom aide, which concerned him, as Child cannot feed or wipe himself, and needed to be reminded to wash his hands. *Id.* at 149. He testified that the agency called because they did not have available staff members, and it asked if family members were able to help. N.T., 6/11/2021, at 112-13. Grandmother was available and became cleared through the agency. Father did not inform Mother before Grandmother started. *Id.* at 112. However, he tried to schedule an appointment with the parenting counselor to discuss the issue. N.T., 7/6/2021, at 149. They were unable to schedule a date, so Father met with the counselor to discuss the best approach to having Grandmother placed as an aide. *Id.* at 155. He then sent a text message informing Mother. *Id.* After Mother called the agency, Grandmother was removed as the aide and Child was again without an aide until the second half of the school year. *Id.* at 150. Mother did not inform Father that she told the agency Grandmother could not work with Child. *Id.* at 161. A different agency provided an aide for Child during the second half of the year, but the aide was often unavailable. *Id.* at 169. He spoke with the agency so that Grandmother could fill in when the assigned aide was unavailable. *Id.*

- 8 -

Father next discussed his communications with Mother regarding homeschooling. He testified that he never agreed to homeschool Child and he cannot think of anything that would cause Mother to believe he agreed with homeschooling. *Id.* at 171. He and Mother had discussions in the summer of 2020 regarding homeschooling Child. N.T., 6/11/2021, at 131. Father testified he asked Mother for more information, "that never came," and he thought Child "should stay in school, where he's enrolled with the current therapists that he'll be getting from school." *Id.* at 134. Father acknowledged he did not tell Mother that he planned to sign Child up for in-person school, but noted Child already was enrolled in school from the prior year. *Id.* at 133. He testified that he told Mother on multiple occasions he was not on board with homeschooling Child. *Id.* at 134.

Mother also testified. She stated that during the spring and summer of 2020, she and Father discussed homeschooling Child. She testified that the final conversation ended with Father saying, "Why don't you draft something up and send it to me in an email," which led Mother to believe they were discussing the possibility of homeschooling Child. *Id.* at 155. She testified she emailed Father a plan in August 2020. *Id.* at 157-58. She testified that she thought they "were on the same page; but in the end he just said no, he's going to school." *Id.* at 160. On cross-examination, Mother acknowledged that in text messages Father stated he did not think it was a good idea to change Child's school and Child would not be withdrawn from the school. N.T., 7/6/2021, at 77, 79. In other exchanges where Mother proposed they could

homeschool, Father stated, "He is going to whatever they offer. Let's get the other parents together and go in as a united parental force. His class is small enough," that he would be willing to pursue private school, and that he did not agree to homeschooling. *Id.* at 79-84. Mother testified she had the impression Father was considering homeschooling because they "formulated a plan of the different times he could cover the speech and occupational therapy" and there were "suggestions given." *Id.* at 100.

Mother further testified that she learned through a text exchange that Grandmother would be a health aide. N.T., 6/11/2021, at 165, 169. Mother testified that Father sent a message requesting a meeting with the parent counselor, but Mother could not make the proposed time and suggested other dates. Father met with the counselor on his own and then sent a text informing Mother that Grandmother was going to act as Child's school aide. *Id.* at 169. Mother did not think it was a good idea, as "conventional wisdom in the Autism community" is that friends and relatives should not be at school with the child. *Id.* Mother informed the first agency she objected, and Grandmother was removed in November 2020. *Id.* at 171. Mother hired the second agency, who placed an aide for Child in January 2021. *Id.* Mother agreed that until Grandmother was hired as an aide, Child did not have an aide for the school year because there was no one available, N.T., 7/6/2021, at 90, but she was not concerned if there was no aide, as there are other people in the room to assist Child when needed. N.T., 6/11/2021, at 177.

Mother testified she wanted Child to see a GI specialist because she needed a renewal of a prescription for Child, but Father did not agree to an appointment with a GI specialist. *Id.* at 179. Child had not seen the GI specialist for three years, and he had been without the prescription for nine months. *Id.* Mother testified that they stopped going to the GI specialist because the specialist was upset that Father was not following the specialist's directions. N.T., 7/6/2021, at 104-05.

On cross examination, Mother responded to questions about a dental appointment in July of 2017. *Id.* at 27. She was dissatisfied with the dentist who extracted teeth from Child. *Id.* at 25. She consented to the work, and subsequently emailed the office to withdraw her consent. *Id.* at 27.

Mother agreed that Father tried to make her aware of Child's appointments and that she did not attend a pediatrician appointment in January 2021. *Id.* at 44. After the January 2021 appointment, Father texted, "[W]eight is okay, no concerns" and "everything went great and the BMI is perfect. He's a little bit short at 48 inches but his weight is 53 pounds." *Id.* at 47. She testified that although she had this information, there was confusion about what percentile he was in. *Id.* at 47-48. She testified that Father does not believe that Child needs to see the GI specialist, but that Child has stomach pains and, although he sees a pediatrician, "the only one who would be able to address gastrointestinal concerns would be a gastrointestinal specialist, not a regular pediatrician." *Id.* at 49, 51. She did not discuss with

Child's pediatrician whether Child should see a GI specialist, but stated it was a recommendation from the CHOP developmental pediatrician. *Id.*

In July 2021, after the hearing, the trial court granted Father sole legal custody and ordered Father "shall make all major decisions affecting the Child's life, including, but not limited to, medical, religious and educational decisions," but that both parties have the right to receive records or reports "normally released to a custodial parent." Order, July 7, 2021, at ¶ 3. The court provided its reasoning on the record. N.T., 7/7/21, at 1-6. The court also denied Mother's petition for contempt and granted Father's counterclaim and modification request.

Mother filed a petition for reconsideration, where, among other things, Mother argued that Father's testimony regarding her alleged behavior at the dentist appointment was not new evidence because he raised it in an August 15, 2017 Petition for Modification. She argued this issue had been resolved by a November 2017 order, whereby the parties continued to share physical and legal custody.

The court vacated the July 2021 order and set argument for August 27, 2021. In September 2021, it denied the petition for reconsideration, denied Mother's petition for contempt, granted Father's counterclaim for civil contempt for disobedience of custody order and modification of a custody order, and awarded Father sole legal custody. Mother filed a timely notice of appeal.

Mother raises the following issues:

1. Did the trial court err as a matter of law, and abuse its discretion in granting Father sole legal custody of the minor child, despite the fact that the trial court found that Father had previously made unilateral decisions with respect to shared legal custody?

2. Did the trial court err as a matter of law, and abuse its discretion in failing to find Father in contempt of court when the trial court found that Father had made unilateral decisions with respect to shared legal custody?

Mother's Br. at 8.

Mother argues that the trial court erred and abused its discretion when it granted Father sole legal custody despite finding Father previously made unilateral decisions. Mother argues that because the court accepted that Father made these unilateral decisions, its decision to award sole legal custody to Father was manifestly unreasonable. Mother points out that the court found ten custody factors were even, one did not apply, two favored Mother, and two favored Father.

Mother also argues that the trial court abused its discretion in finding Mother was not credible. She argues the court found her credible after the prior hearing and did not support its credibility finding this time. Mother also notes that the court found Viscomi, Bednarski, and Hadeed credible, and their testimony supports that Mother is well informed regarding autism. Mother also claims that Viscomi testified she observed Father be disparaging toward Mother and that Bednarski used the terms "bullied" and "intimidated" with regards to Father. Mother claims the testimony supported her position that the therapy time would be better spent at home, rather than at gymnastics at Parkettes.

Mother further argues that the trial court impermissibly based its decision on testimony from Father that Mother was intoxicated at a 2017 dentist appointment for Child. Mother argues this had been previously litigated by Father and resolved by a 2017 custody order and Father presented no independent evidence or testimony to support a finding she was intoxicated at the appointment.[2]

We review a custody order for an abuse of discretion. *See G.A. v. D.L.*, 72 A.3d 264, 268 (Pa.Super. 2013) (quoting *Collins v. Collins*, 897 A.2d 466, 471 (Pa.Super. 2006)). We must accept a trial court's factual findings when the record supports them, and we defer to the trial court's credibility determinations. *Id.* We must determine "whether the trial court's conclusions are unreasonable as shown by the evidence of record." *Id.* (quoting *Collins*, 897 A.2d at 471). We will reject the trial court's conclusions "only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court." *Id.* (quoting *Collins*, 897 A.2d at 471).

This Court has held that:

> [t]he discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

---

[2] Father raised Mother's intoxication at the dentist appointment in a 2017 petition. Mother denied it. The parties resolved the petition by a stipulation.

*Ketterer v. Seifert*, 902 A.2d 533, 540 (Pa.Super. 2006) (quoting *Jackson v. Beck*, 858 A.2d 1250, 1254 (Pa.Super. 2004)).

The Child Custody Act requires a trial court to consider all the Section 5328(a) factors when "ordering any form of custody." 23 Pa.C.S.A. § 5328(a). A trial court must "delineate the reasons for its decision when making an award of custody either on the record or in a written opinion." *R.L. v. M.A.*, 209 A.3d 391, 395 (Pa.Super. 2019) (quoting *S.W.D. v. S.A.R.*, 96 A.3d 396, 401 (Pa.Super. 2014)). The court does not need to explain its decision in detail; rather, "all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *Id.* (quoting *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013)).

In child custody cases, the paramount concern "is the best interests of the child." *Id.* (quoting *C.G. v. J.H.*, 193 A.3d 891, 909 (Pa. 2018)). "The best-interests standard, decided on a case-by-case basis, considers all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *Id.* (quoting *M.J.N. v. J.K.*, 169 A.3d 108, 112 (Pa.Super. 2017)). The custody factors to be considered include:

> (a) Factors.—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:
>
> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

Here, after the hearing, the court found Ms. Viscomi, Ms. Bednarski, Ms. Hadeed, Grandmother, and Father credible, and Mother not credible. It considered the custody factors and found factors two, three, four, five, six, nine, twelve, and fifteen favored neither party. It noted there was no evidence of abuse, the parents shared physical and legal custody, and Child did not have siblings. The court did not interview Child and therefore did not consider his preference. Also, the court found the parties lived close enough to share custody.

The court made the following finding for factor thirteen – the level of conflict and the willingness to cooperate: "I considered communicating the Child's illness/activities to the other parent as evidence of willingness to cooperate. The level of conflict between Father and Mother is high and their willingness and ability to cooperate with one another is low. The parties have great difficulty working together. Each presented evidence that the other failed to communicate sufficiently and failed to cooperate in addressing issues related to the health, education, and welfare of the Child. It appears that both Father and Mother contribute to the difficulties they have in communicating with each other." N.T., 9/22/2021, at 6.

It found factors one and eight favored Mother. It found factor one, which party is more likely to encourage contact with the other parent, favored Mother because that was its finding in 2016 and no additional evidence on the factor was presented. For the same reason, it found the eighth factor – attempts to turn the child against a parent – favored Mother.

The court found the tenth and fourteenth factors favored Father. For factor ten – the party more likely to attend to the daily physical, emotional, developmental, educational and special needs of Child – it concluded "I have considered religious training and doctor visits. Father has been consistent in this regard. Mother has not; she has missed appointments and, one time, showed up intoxicated to the Child's dentist appointment." *Id.* at 5. The court found the fourteenth factor – history of drug or alcohol abuse – favored Father due to evidence that Mother was intoxicated at a dentist appointment.

For the sixteenth factor – any other relevant information – the court considered the following:

> I accept the evidence that Father has made several unilateral legal custody decisions including, but not limited to: Enrolling the child in public school without [M]other's agreement at a time when the parties were discussing the option of home-schooling the Child; having the child's paternal grandmother assigned as the child's Health Aide without [M]other's approval; and not giving [M]other authorization to obtain the child's prescription medication. One party making decisions unilaterally is not good and weighs against Father. However, I must balance that behavior against Mother's unreliability and instability in showing up intoxicated at the child's dentist appointment, her sometimes vague communications with Father, and her behavior towards the child's providers. On the one hand,

> [M]other's passion for addressing the child's autism can be a positive thing to a point, but [M]other's passion in this regard has become a negative thing because [it] resulted in poor behavior toward the very people who provide services for the child.

*Id.* at 7.

After hearing Mother's arguments regarding reconsideration, the court acknowledged it was a close case in which both parents had done some negative things. However, it ultimately determined that sole legal custody should be with Father:

> The court . . . acknowledges that this is a close case. Father has done some negative things and [M]other has done some negative things. This is not a decision between a clearly "good" parent and a clearly "bad" parent. A further complication is that the child's autism poses significant challenges. The parties have demonstrated an inability to cooperate and communicate effectively about issues related to the child's health, education and welfare, which are issues of legal custody. Thus, the court is forced to choose one of them to exercise sole legal custody. By selecting Father to do so, we can at least be assured that the child will be enrolled in public school. The court acknowledges that children can be effectively educated at other types of schools and via homeschooling. However, when forced to select between public school and an uncertain educational alternative, the court must act conservatively and select the public school, which assures a minimum of educational competency. The fact that [M]other appeared at a dentist appointment intoxicated is significant to the court, especially in light of her prior history of alcohol use. This conduct shows that I cannot reasonably conclude that [M]other is stable and able to make good decisions for the child. Also, I find [M]other generally not credible at this trial. Mother argues that, because the Court found Father not credible in past decisions, the court must continue to find him not credible and vice versa as to [M]other. This is simply not true. Credibility findings by the court can change from one court proceeding to another.

- 19 -

Mother also argues that, if the court chooses to not award her sole legal custody, it should award her legal custody as to medical decisions even if it awards Father legal custody as to educational decisions. While such a division of legal custody can work in some cases (and this court has so ruled in other cases), in this case, due to the severity of the child's autism as described by the parties and witnesses, educational and medical decisions are so inextricably intertwined, that splitting legal custody as Mother suggests would be functionally equivalent to awarding shared legal custody. Because the parties are clearly unable to work together, which they both admit by their competing requests for sole legal custody and their rigid positions, shared legal custody in any form will not work with these parties and will only perpetuate the conflict between [M]other and Father, which is certainly not in the child's best interest.

*Id.* at 8-10.

The trial court did not abuse its discretion. The record supports the court's factual findings, and its legal conclusions are not unreasonable. Further, we defer to the court's credibility determinations, including its determination that Mother was not credible. As the court noted in its findings on the motion to reconsider, it was not required to make the same credibility determinations it had made after prior hearings. Rather, credibility determinations can change from proceeding to proceeding. Further, contrary to Mother's assertion, the court was not required to award her legal custody because it found Father made unilateral decisions. Rather, the court was required to factor Father's actions into its decision, when considering the best interests of Child, and the court did so. Moreover, although there was testimony that, on at least one occasion, a therapy provider felt intimidated by Father, there also was testimony that the providers felt intimidated and

uncomfortable with Mother, including testimony that Mother told a provider that the agency was committing insurance fraud.

We next address Mother's claim that the court erred in relying on the testimony that she was intoxicated at a dentist appointment in 2017. Mother did not object to testimony about the dentist appointment at the hearing and did not claim until the motion to reconsider that it had been previously resolved. As Mother did not object at the hearing, she waived the argument that the court should not consider the testimony. **See** Pa.R.Evid. 103(a); Pa.R.A.P. 302(a). Further, testimony that Mother was intoxicated, which was disputed by Mother when she cross-examined Father, is relevant to whether she should have sole legal custody of Child.

In her second issue, Mother claims the trial court erred in failing to find Father in contempt where it found he had made unilateral decisions regarding shared legal custody. She argues that she proved he violated the court order.

We review a contempt order for an abuse of discretion. **N.A.M. v. M.P.W.**, 168 A.3d 256, 261 (Pa.Super. 2017). A court abuses its discretion if "its conclusion[] overrides or misapplies the law" or if it "exercises judgment which is manifestly unreasonable, or reaches a conclusion that is the result of partiality, prejudice, bias or ill will as shown by the evidence of record." **Id.** (quoting **Gates v. Gates**, 967 A.2d 1024, 1028 (Pa.Super. 2009)).

The party petitioning for contempt must prove, by the preponderance of the evidence, "(1) that the contemnor had notice of the specific order or decree which he is alleged to have disobeyed; (2) that the act constituting the

contemnor's violation was volitional; and (3) that the contemnor acted with wrongful intent." ***J.M. v. K.W.***, 164 A.3d 1260, 1264 (Pa.Super. 2017) (*en banc*) (quoting ***P.H.D. v. R.R.D.***, 56 A.3d 702, 706 n.7 (Pa.Super. 2012)).

It was not an abuse of discretion for the trial court to deny Mother's petition for contempt. The court did not provide its reasons, but it need not find Father in contempt merely because it found he made unilateral decisions. It was within the court's discretion to determine that any violation was not volitional or done with wrongful intent such that the court should find him in contempt.

Order affirmed.

Judge King joins the memorandum.

Judge Dubow concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/3/2022